737 F.2d 320
 Fed. Sec. L. Rep. P 91,514
Max A. RUEFENACHT
v.
Christopher J. O'HALLORAN, Joachim K. Birkle and Continental
Import & Export, Inc., and W. George Gould.
Christopher J. O'HALLORAN, Third-Party Plaintiff,
v.
W. George GOULD, Esq., Third-Party Defendant.
W. George GOULD, Third-Party Plaintiff,
v.
David BERNSTEIN, Autobern Trading Co., Inc., Ernest
Stoecklin, Lenzenhof GMBH, Third-Party Defendant.
Appeal of Max A. RUEFENACHT.
 No. 83-5493.
 United States Court of Appeals,
Third Circuit.
 Argued May 14, 1984.
Decided June 11, 1984.
 
 Peter S. Pearlman, Cohn & Lifland, Saddle Brook, N.J., for appellant.
 Robert C. Epstein, Elizabeth A. Weiler, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J., for W. George Gould.
 James T. O'Halloran, Tompkins, McGuire & Wachenfeld, Newark, N.J., for Christopher J. O'Halloran; Robert J. Kelly, Washington, D.C., of counsel.
 Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Rosalind C. Cohen, Asst. Gen. Counsel, Lawrence W. Koltun, Atty., S.E.C., Washington, D.C., amicus curiae; Paul Gonson, Sol., Washington, D.C., of counsel.
 Before GIBBONS and HUNTER, Circuit Judges, and RAMBO, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This appeal requires that we determine whether stock transferred to effectuate the sale of all or part of a business is a "security" within the meaning of the 1933 and 1934 Securities Acts.[1] The district court, holding that the purchase or sale of 50 percent of the stock of a business is a security only if the transaction satisfies the "investment contract" or "economic reality" test of SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), entered summary judgment for the defendants. The plaintiff, and the Securities and Exchange Commission as amicus curiae, urge that the district court erred in applying the Howey test in these circumstances. The question whether the Howey test applies to the sale of stock having the traditional attributes of stock ownership is the subject of considerable academic commentary[2] and has produced a split of authority in the circuits.[3] Joining the Second, Fourth, Fifth and Eighth Circuits, we hold that the Howey test does not apply to the sale of all or part of a business effectuated by the transfer of stock bearing the traditional incidents of stock ownership. Thus we reverse.
 
 
 2
 I. Facts and Proceedings in the District Court
 
 
 3
 Continental Import & Export, Inc., is an importer of wines and spirits. Joachim Birkle is president of Continental and, until 1980, owned or controlled 100 percent of its stock. Ruefenacht, the plaintiff, alleges that early in 1980 he purchased 2500 shares of Continental's stock for $250,000--said to represent 50 percent of the company--in reliance on financial documents and other oral representations made by Birkle, Christopher O'Halloran, a certified public accountant, and W. George Gould, Continental's corporate counsel.
 
 
 4
 In deposition testimony, Ruefenacht asserted that the consideration for the price paid for Continental's stock included a promise by him to devote certain efforts to the firm's business. In conformance with that promise, Ruefenacht engaged in various activities on behalf of company. In the summer of 1980, for example, he solicited contracts to import beverages on behalf of the firm. On other occasions Ruefenacht participated in the hiring of company employees. He also applied for and received a state liquor license (or solicitor's permit), representing at that time that he would sell alcoholic beverages to wholesalers and receive in return a salary and compensation for expenses. On another occasion Ruefenacht signed a banking resolution denominating himself an officer of Continental. That resolution was signed at Birkle's request for the purpose of permitting Ruefenacht to sign corporate checks when Birkle was out of the country.
 
 
 5
 The record also reveals that Ruefenacht participated in the affairs of Continental in other minor ways. He attended luncheon meetings, occasionally translated documents, maintained telephone contact with Continental employees on a regular basis, and visited warehouses considered for use by Continental. While engaging in these activities, however, Ruefenacht remained a full-time employee of another corporation. Moreover, his actions on behalf of Continental were at all times subject to the veto of Birkle.
 
 
 6
 After Ruefenacht paid $120,000 of the total $250,000 purchase price for Continental stock, he began to doubt the accuracy of certain representations made to him by Birkle and others. Soon thereafter he filed this action, alleging violations of sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. Secs. 77l (2), 77q(a) (1982), section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1982), and Rule 10(b)(5), 17 C.F.R. Sec. 240.10(b)(5) (1983). Ruefenacht charges that financial statements prepared by O'Halloran and signed by Birkle overvalued Continental's goodwill and licenses by $243,000; that these financial statements assigned a $400,000 value to import or contract rights with no substantial worth; that the firm reported a surplus when in actuality it maintained a deficit; and that the defendants represented that net profits on sales between 1980 and 1981 would be $848,000 under a nationwide distribution program, and $1.197 million in the New York area, when in fact Continental was not seriously negotiating contracts for nationwide distribution at all and could not reasonably project these net earnings. In reliance on these representations, Ruefenacht alleges, he had purchased 1000 shares of Continental's stock and had advanced $120,000 to Birkle. The complaint seeks rescission and restoration of the amount paid. Ruefenacht also pleads pendent state claims for fraud and breach of fiduciary duties.[4]
 
 
 7
 The district court granted summary judgment for defendants, concluding that the stock purchased by Ruefenacht was not a "security" within the meaning of the 1933 and 1934 Acts. The court so concluded not because the instrument purchased by Ruefenacht lacked any of the indicia of stock ownership; indeed, the court conceded that the "stock which Ruefenacht received contains all the attributes mentioned by the Forman[5] Court as indicating that the transaction did involve a security." App. at 220. Rather, the court held, the instrument was not a "security" because of the degree of Ruefenacht's control over Continental's business. "Because Mr. R[ue]fenacht intended to jointly manage Continental with Mr. Birkle," the district court reasoned, "he did not purchase 'securities' as defined in the federal acts." App. at 309. Finding no federal jurisdiction over the securities claims, the district court dismissed the complaint in its entirety.
 
 II. History of the Sale-of-Business Doctrine
 
 8
 The 1933 and 1934 Securities Acts include within the definition of "security" a series of specific terms--e.g., "note," "stock," "bond," and "debenture"--and thereafter employ a number of more general phrases--e.g., "investment contract," "any interest or instrument commonly known as a 'security.' "[6] As early as 1943 the Supreme Court held that certain novel economic transactions were encompassed within these latter, more generic terms, even though not embraced by their more specific provisions like "stock," "bond," or "note." See SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 348-55, 64 S.Ct. 120, 122-25, 88 L.Ed. 88 (1943) (holding that leasehold interests in property adjacent to exploratory oil wells were "securities"). The Court's leading opinion on this point, SEC v. W.J. Howey Co., 328 U.S. 293 (1946), held that agreements for the sale of a citrus crop coupled with optional service contracts were "investment contracts." Howey propounded a definition of "investment contract" derived from descriptions widely employed in state "blue sky" laws: an investment contract, the Court held, is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." Id. at 298-99, 66 S.Ct. at 1102-03. This definition came to be known as the "Howey test" and led many courts to classify a variety of novel economic schemes as "investment contracts."[7]
 
 
 9
 While the courts were giving the term "investment contract" a broad compass, the more specific term "note" was read narrowly, so as not to embrace every instrument comporting with the Acts' terms that is technically a "note" under state law. The first appellate holding that not every such "note" is a "security" under the federal Acts is this court's decision in Lino v. City Investing Co., 487 F.2d 689 (3d Cir.1973).[8] In Lino, this court held that a personal promissory note tendered as partial consideration for rights under a franchise agreement was not a "note" under the federal Acts. Id. at 693-96. Significantly, we did not apply the Howey test to the notes in question, as Part I of the opinion pointedly made clear by applying the Howey test to the franchise agreements themselves. Id. at 691-93. Rather, we examined the entire context of the note transaction, declining at that time to expound "a 'test' ... that would aid in determining whether there has been a purchase or sale of securities when a personal promissory note is involved." Id. at 696 n. 15.
 
 
 10
 Following Lino 's lead, several courts strove to define the circumstances under which a "note" should be considered a "security" under the Securities Acts. The Fifth Circuit sought to determine whether a note comprised an "investment."[9] The Ninth Circuit approached the problem on a slightly different tack, seeking to determine whether the lender supplies "risk capital" to the maker.[10] In a leading opinion written by Judge Friendly, the Second Circuit rejected both of these approaches. See Exchange National Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126 (2d Cir.1976) (Friendly, J.). In part the Second Circuit feared that the "investment" and "risk capital" tests obliterated Congress' carefully drawn distinctions among those notes included within and excluded from the Acts. Congress took care to provide that any note arising out of a "current transaction" and having a maturity not exceeding nine months was excluded from the registration provisions, but included in the anti-fraud provisions, of the 1933 Act;[11] and that any note with a maturity not exceeding nine months was excluded from the 1934 Act.[12] As the Fifth Circuit candidly acknowledged, its "investment test" "virtually writes [these distinctions] out of the law." McClure v. First National Bank of Lubbock, 497 F.2d 490, 494 (5th Cir.1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). In addition, the Second Circuit expressed concern over the uncertainty that would inevitably follow from a weighing of factors "without any instructions as to [their] relative weights." Exchange National Bank, 544 F.2d at 1137. In lieu of the "investment" and "risk capital" approaches, the Second Circuit enumerated a family of note transactions presumptively excluded from the Act--all concerning consumer financing or business financing of current costs--and held that other notes not bearing the family pedigree were presumptively securities under federal law.[13]
 
 
 11
 There matters stood when late in 1976 the Seventh Circuit held that the Howey test for "investment contract" applies to determine whether a "note" is a security under the Acts. Emisco Industries, Inc. v. Pro's Inc., 543 F.2d 38, 39-40 (7th Cir.1976). The extension of Howey into the note arena was problematical. This application of Howey further obliterated the special statutory distinctions drawn by Congress among notes included in and excluded from the Acts, and injected into the note area the same uncertainty that pervades litigation over the inherently vague term "investment contract." Moreover, the Seventh Circuit doctrine seemed to ignore some important statutory policies underlying the securities Acts. As the legislative history makes abundantly clear,[14] one such policy is the protection of "investors"; and to the extent that Howey maps the entire set of "investors" marked for protection--not an obviously correct assumption--then that policy may be satisfied. But a second policy of the Acts is, as we observe below, the protection of the marketability of certain instruments of commerce, whether or not purchased by "investors" under the Howey formula. Among the favored instruments, for example, is certain commercial paper.[15] Several commentators have perceptively remarked that an application of the "investment" or "Howey " tests to these commercial instruments would undermine federal protection for many instruments most deserving of coverage.[16]
 
 
 12
 Notwithstanding these concerns, in 1981 the Seventh Circuit extended the Howey or "economic reality" test to the purchase or sale of stock. Frederikson v. Poloway, 637 F.2d 1147 (7th Cir.), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981). While the extension of the Howey test to the note area had been greeted with some concern, the further extension of that doctrine to the purchase or sale of stock sparked a considerable amount of alarm.[17] While the difficulties attending the simple extension of Howey to notes still applied, two other difficulties loomed even larger.
 
 
 13
 First, at least in the note area there is, as we held in Lino, some necessity for fine-tuning the definition of "note" to avoid sweeping within the coverage of section 10(b) of the 1934 Act every consumer and business loan financing current operational costs. But there is no such necessity in the stock area. Stock is a well-defined term, is not issued by consumers, and is not ordinarily employed by business to finance current transactions. While the importation of the Howey test into the note arena might be justified as an expedient--albeit an imperfect one--for limiting the definition of "note," no such expedient seems necessary for the issue of stock.
 
 
 14
 Second, because the Howey test turns in part on whether the purchaser derives profits "from the entrepreneurial or managerial efforts of others," see United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), a central aspect of the test, when applied to stock, requires a determination whether the purchaser exercises a controlling share of the corporation.[18] A controlling share may be exercised with less than 100 percent stock ownership--indeed, at times with far less than 50 percent ownership. See Sutter v. Groen, 687 F.2d 197, 203 (7th Cir.1982). Thus an instrument might be transformed from a security into a non-security by virtue of a small increase in the number of shares traded. Instruments purchased by multiple investors might be securities as to some purchasers and non-securities as to others, or securities as to sellers but not as to purchasers.[19] Instruments might be securities if traded in a series of small transactions but non-securities if the same transaction is effectuated in a single sale. To many judges and lawyers with up to 50 years of experience with the securities laws, these seemed extraordinary consequences.[20]
 
 
 15
 The case now before us illustrates just how far the extension of Howey from investment contract to note to stock may be taken. Ruefenacht is the purchaser of 50 percent of the stock of Continental. Had he purchased only 49 percent, Ruefenacht would presumably have lacked corporate control, rendering the instrument purchased (at least presumptively) a security. Had he purchased 51 percent, in contrast, the instrument would presumptively not have been a security. Both presumptions, of course--at least under the Seventh Circuit approach, see Sutter, 687 F.2d at 203--would have been subject to rebuttal. Because Ruefenacht purchased exactly 50 percent, a more sophisticated analysis would presumably be required--although just what that analysis should be is less than obvious.
 
 
 16
 III. The Securities Acts as Interpreted by the Supreme Court
 
 
 17
 If Congress or the Supreme Court has mandated these results, then, regardless of their deficiencies in logic, we would be bound to apply them. We turn, therefore, to the language, history, structure, and policies of the 1933 and 1934 Acts. Then we consider the impact of recent Supreme Court decisions.
 
 A.
 Statutory Language, Structure, and History
 1. The definition and exemption provisions
 
 18
 Section 2(1) of the 1933 Act as amended provides that the term "security"
 
 
 19
 means any note, stock, treasury stock, bond, debenture, ... investment contract, ... or, in general, any interest or instrument commonly known as a "security"....
 
 
 20
 15 U.S.C. Sec. 77b(1) (1982). The legislative history to section 2(1) indicates that Congress cast the definition of security "in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.R.Rep. No. 85, 73d Cong., 1st Sess. 11 (1933).
 
 
 21
 Although Congress intended that the term "security" embrace those instruments that "fall within the ordinary concept of a security," several important qualifications limit this definition. Preceding all of the definitions in the 1933 Act is the clause "unless the context otherwise requires." The significance of the so-called "context clause" is addressed in Part III A 3 infra.
 
 
 22
 In addition, section 3 of the 1933 Act defines a number of important "exempted securities." Among the defined exemptions in the 1933 Act is an exception for short-term notes. Section 3(a) provides that the Act shall not apply to:
 
 
 23
 Any note, draft, bill of exchange, or banker's acceptance which arises out of a current transaction ... and which has a maturity at the time of issuance of not exceeding nine months....
 
 
 24
 15 U.S.C. Sec. 77c(a)(3) (1982). As one commentator has observed, Congress intended the short-term note exemption to free from the Act's registration requirements prime quality commercial paper sold to knowledgeable investors. The necessity for disclosure in a registration statement to these investors was less vital than for sales of other, more speculative paper to other, less knowledgeable buyers.[21] Congress did not, however, include the "commercial paper" exception in the antifraud provisions of the 1933 Act. See 15 U.S.C. Sec. 77q(c) (1982).
 
 
 25
 The 1933 Act also empowers the Commission to grant additional exemptions. Section 3(b) of the Act as amended provides that:
 
 
 26
 The Commission may from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed therein, add any class of securities to the securities exempted as provided in this section, if it finds that the enforcement of this subchapter with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount at which such issue is offered to the public exceeds $5,000,000 [then $100,000].
 
 
 27
 15 U.S.C. Sec. 77c(b) (1982). Congress envisioned that the Commission's exemption power would be reserved for "needless registration of issues of such an insignificant character as not to call for regulation." H.R.Rep. No. 85, supra, at 15. According to the House Report, however, the Commission's exemption power was carefully limited by the prohibition on exemptions for issues larger than $100,000 (now $5,000,000), "thus safeguard[ing] against any untoward pressure to exempt issues whose distribution may carry all the unfortunate consequences that the act is designed to prevent." Id.
 
 
 28
 The definition of "security" under the 1934 Act parallels that under the 1933 Act. Section 3(a)(10) of the 1934 Act provides that " 'security' means any note, stock, treasury stock, bond, debenture, ... investment contract, ... or in general, any instrument commonly known as a 'security.' " 15 U.S.C. Sec. 78c(a)(10) (1982).[22] One important distinction between the 1933 and 1934 Act definitions pertains to short-term notes: generally speaking, short-term notes that would be exempt from the registration provisions of the 1933 Act are exempted from the antifraud provisions of the 1934 Act.[23] And like the 1933 Act, section 3(a)(12) of the 1934 Act authorizes the SEC to grant additional exemptions for classes of securities either unconditionally or upon specialized terms and conditions.[24] 15 U.S.C. Sec. 78c(a)(12) (1982).
 
 
 29
 Nowhere in these provisions is there an exemption for the sale of a controlling share of corporate stock. This conspicuous omission is significant for two reasons. First, Congress took pains to exempt certain commercial paper from the class of "notes" covered by the registration provisions of the 1933 Act and the antifraud provisions of the 1934 Act. When Congress wished to exempt a class of instruments from some or all of the Acts' provisions, it had little trouble in doing so expressly.[25] And while it might be argued that purchasers of large blocks of stock, often in face-to-face transactions, are more knowledgeable than the average investor--and therefore often less in need of protection--the same argument applies to the commercial paper exception. Congress exempted certain commercial paper in part because it is high-grade and purchased by knowledgeable investors; accordingly, the SEC approves for exemption only that commercial that is "prime quality" and "of a type not ordinarily purchased by the general public." See note 15 supra. These arguments persuaded Congress to exempt prime quality commercial paper expressly. Congress did not, however, exempt particular stock transactions. Moreover, while Congress may not have considered the sale of all or part of a business by means of a stock purchase under the 1933 Act--the Act is, of course, primarily addressed to "public offerings," see 15 U.S.C. Sec. 77d(2) (1982) (private offering exemption), and the sale of a business is frequently not effectuated by a "public offering"--the same cannot be said of the 1934 Act. It was always clear that the 1934 Act would, by its terms, apply to stock purchases comprising controlling corporate shares. Nor can it be said that Congress did not envisage face-to-face transactions; it has always been clear that the Act applies to face-to-face sales of stock as well as to transactions in the recognized markets. See Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982); Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 10, 12, 92 S.Ct. 165, 167, 169, 30 L.Ed.2d 128 (1971) ("Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face").[26]
 
 
 30
 Second, Congress vested in the SEC the responsibility for identifying certain securities for exemption. In addition, Congress empowered the SEC to attach conditions to any exemptions granted in order to protect the investing public. These decisions suggest that in the judgment of Congress the Commission, and not the courts, has the expertise and practical experience required to ensure that exemptions to the Act are prudently chosen, and that appropriate conditions are attached to any exemptions granted. Needless to say, the SEC has never exempted the purchase or sale of a controlling share of corporate stock from the definition of security. Thus we look on the plea that this court do so with some skepticism.
 
 
 31
 2. Text of the definitions and early interpretations
 
 
 32
 The definition of "security" under both Acts begins with an enumeration of specific terms--"note," "stock," "bond," "debenture"--and then proceeds to more general phrases, including "investment contract." This procession from the specific to the general did not escape the Supreme Court's attention on its first occasion to consider the definition of "security." In SEC v. C.M. Joiner Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), the Court observed:
 
 
 33
 In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a security." We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included within any of these definitions, as a matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as [a] matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character as "investment contracts," or as "any interest or instrument commonly known as a 'security.' "
 
 
 34
 320 U.S. at 351, 64 S.Ct. at 123 (emphasis added). Thus, the Supreme Court recognized that instruments like "stock," "bonds," and "notes" answer "on their face ... to the name or description." The Acts' latter phrases, intended to supplement these common instruments, were devised to capture "[n]ovel, uncommon, or irregular devices" that were not so readily classified. This construction is consistent with the fact that the terms "stock," "bond," and "note" had well-defined meanings under state corporate law that Congress obviously had incorporated by reference, and that Congress did not intend the reach of the Act to stop with these well-defined terms alone.
 
 
 35
 The Court's next bout with the definition of security confirmed that the phrase "investment contract" also drew on state law for its content. In SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court held that in the words "investment contract" Congress had employed a term "common in many state 'blue sky' laws." Id. at 298, 66 S.Ct. at 1102. Despite Justice Frankfurter's position in dissent that the phrase " 'investment contract' is not a term of art," id. at 301, 66 S.Ct. at 1104 (Frankfurter, J., dissenting), the Court held that by "including an investment contract within the scope of [the Act], Congress was using a term the meaning of which had been crystallized by [state] judicial interpretation[s]." Id. at 298, 66 S.Ct. at 1102. These state definitions, the Court held, "had been broadly construed by state courts so as to afford the investing public a full measure of protection." Id.
 
 
 36
 Thus, by 1946 it was plain that the definitions in the 1933 and 1934 Act drew on state law for their content, and that in order to embrace novel or unusual investment schemes within the salutary provisions of the Acts, Congress supplemented standard state-law definitions of "stock," "note," etc., with more general phrases, including "investment contract," drawn from state law. Joiner and Howey make plain that Congress did not intend to circumscribe the scope of the standard terms--"stock," "note," "debenture"--to that of the more generous phrases. To the contrary, that construction would turn the history of the Acts and the state-law definitions on their heads. Congress never intended that "stock" that did not also satisfy the definition of "investment contract" would not be within the Acts' terms. Rather, Congress intended that "investment contracts" that did not also satisfy the definition of "stock" would be within the Acts' terms. See Tcherepnin v. Knight, 389 U.S. 332, 343, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967) (Joiner "rejected the respondents' invitation to 'constrict the more general terms substantially to the specific terms which they follow' ").
 
 
 37
 The language of the definition itself makes this consideration clear. As the Second Circuit recently noted, there would have been little reason for the drafters to have employed words like "stock," "bond," and "note"--which had clear definitions under state law--if their intention had been to include only those instruments that satisfied an "economic reality" test appropriate to the latter terms. If an economic reality test appropriate to these subsequent terms were intended, "a substantial portion of each class of instrument would, in fact, not be within the definition." Golden v. Garafalo, 678 F.2d 1139, 1144 (2d Cir.1982).
 
 
 38
 To be sure, the Howey Court also admonished that "[f]orm was [to be] disregarded for substance" and that "emphasis was [to be] placed upon economic reality." 328 U.S. at 298, 66 S.Ct. at 1102. Those words were written, however, in the context of disregarding the absence of a label like "stock" or "note" when novel schemes nonetheless constitute "investments" earning profits from the labor of others. They did not direct us to ignore the presence of an instrument that, as a matter of economic reality, is "stock" simply because it is not purchased by one who also entered into an "investment contract."
 
 
 39
 In summary, neither the language, the history, the structure, nor the Acts' early interpretations suggest that the transfer of stock to effectuate the sale of all or part of a business is not the purchase or sale of a "security." And several considerations--particularly Congress' express treatment of notes and its conferral on the SEC of the power to specify exempt securities--suggest the contrary. We now consider the impact of the "context clauses" on our analysis.
 
 
 40
 3. The "context clauses"
 
 
 41
 Each of the definitional sections of the 1933 and 1934 Acts begins with the words, "When used in this [sub]chapter, unless the context otherwise requires--." 15 U.S.C. Secs. 77b, 78c(a) (1982). These clauses, the defendants maintain, authorize us to narrow the definition of "stock" as the "economic realities" require. In considering this position, we turn to the history and function of the clauses.
 
 
 42
 Perhaps the most notable feature about the "context clauses" is that they do not appear in the paragraphs defining "security" at all. Instead, these clauses precede all fifteen definitions in the 1933 Act and all forty definitions in the 1934 Act. Plainly, the "context clauses" were not directed particularly at the definition of "security." This lack of particular application is underscored by the legislative history of the definitions of "security." In neither the House nor the Senate reports, for example, did the drafters allude to the clauses or indicate that particular kinds of stock, notes, or debentures are embraced by the Act "only when the context requires." If the drafters had indeed intended that the context clause exempted certain named securities from coverage, they certainly made no mention of it.
 
 
 43
 The legislative evolution of the 1933 Act suggests even more strongly that the context clauses had no such purport. Section 2 of the Senate version of the 1933 Act provided, "When used in this Act the following terms shall, unless the text otherwise indicates, include the following respective meanings." H.R. 5480, 73d Cong., 1st Sess. 39 (1933) (emphasis added) (as enacted by the Senate on May 10, 1933); S. 875, 73d Cong., 1st Sess. 1 (1933). This Senate bill tracked the language of an early House bill, H.R. 4314, which had also opened with the phrase "unless the text otherwise indicates." H.R. 4314, 73 Cong., 1st Sess. 2 (1933). Early in the legislative process, however, the House Committee on Interstate and Foreign Commerce substituted the language "unless the context otherwise requires" for the phrase "unless the text otherwise indicates." See H.R. 5480, 73d Cong., 1st Sess. 1 (1933) (as enacted by the House on May 5, 1933). Ultimately the Conference Committee adopted the House version. Although the Conference Committee Report discusses a number of significant distinctions between the House and Senate definitions, the Report makes no mention of the difference between these prefatory clauses. See H.Conf.Rep. No. 152, 73d Cong., 1st Sess. 24-25 (1933).
 
 
 44
 It seems evident that the drafters did not attribute particular significance to the distinction between these House and Senate phrases. The "text" to which the Senate had adverted was obviously the text of the statute itself. Similarly, the "context" to which the House referred was obviously the context in which the defined words appear in the statute itself. Both the House and Senate provisions were intended to direct that the ensuing definitions were to be used throughout the statute unless the text of the Act expressly, or another section of the statute implicitly, made them inapplicable to that section.[27]
 
 
 45
 The defendants, however, would have us attribute a very different meaning to the "context" language. That language, they assert, refers not only to the statutory context but to the context of the underlying factual transaction.[28] Thus, they argue, the House and Senate versions of the 1933 Act had very different meanings. The Senate version, of course, would not have admitted of the defendants' interpretation, for it would have authorized exceptions as "the text otherwise indicates," not as the factual circumstances seem to warrant. The House version, in contrast, as the defendants construe it, sanctioned a wide-ranging exemption power varying with the facts and circumstances. It strikes us that if the conferees had observed so considerable a distinction between the House and Senate bills and had selected the broader, House version, they would at least have remarked upon so important a subject. Moreover, a wide-ranging exemption power is inconsistent with the Act's conferral of exemption power on the SEC. Because the Act conferred a narrowly tailored exemption power on the Commission, it seems extraordinary that the conferees should not have remarked upon a decision to confer a potentially broader power through the context clause.
 
 
 46
 These considerations lead us to conclude that the context clauses themselves do not authorize judicial exclusions of securities from the scope of the Act when the "factual circumstances" seem to warrant it. Of course, we do not thereby adopt a wooden approach to statutory construction. The Supreme Court has often admonished that a "thing may be within the letter of the statute and yet not within the statute." United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) (quoting Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). We simply observe that Congress did not intend the context clause as a font of authority to narrow the compass of the term "stock" when the underlying facts may seem to warrant. If that result is to obtain, it must devolve from some other indication in the language, structure, or legislative history of the Acts. The context clause alone is no such authority.[29] As Judge Friendly has written, "[s]o long as the statutes remain as they have been for over forty years, courts had better not depart from their words without strong support for the conviction that, under the authority vested in them by the 'context' clause, they are doing what Congress wanted when they refuse to do what it said." Exchange National Bank, 544 F.2d at 1138.
 
 IV.
 A.
 Policy Considerations
 
 47
 As additional guides to Congress' intent, we examine the reasons and policies that gave rise to protection of securities under the 1933 and 1934 Acts.
 
 
 48
 l. Uncertainty of application
 
 
 49
 The most prominent feature of the sale-of-business doctrine is its attendant uncertainty of application, and for that reason we address this feature first. We agree with the Seventh Circuit that corporate control may be exercised with less than 100 percent of the outstanding stock of a firm, and therefore that if the sale-of-business doctrine is to be applied, it must logically be extended to all such purchases and sales. Sutter v. Groen, 687 F.2d 197, 203 (7th Cir.1982). No doubt, for example, the doctrine must be applicable with equal rigor to the purchase of 15 percent of a firm's stock as to the purchase of all 100 percent. This conclusion raises the specter of examining, in every securities transaction, the nicities of corporate control. Such an examination would be no small task. Control may be exercised, for example, by alliances of minority shareholder factions. One indicator of whether a minority share effectively exercises control might be whether the purchase price of the share exceeded the prevailing market price. Another might be the voting patterns of various factions. Yet another might be the extent of management involvement by the faction, including, for example, whether various management employees were appointed by or are allied with that faction. And of course, testimony might be taken on the intent of the purchasers and the realities of corporate management. Even a purchaser who acquires more than 51 percent of the stock may not control with respect to certain corporate modifications for which the certificate of incorporation or state law may require supermajorities. E.g., 8 Del.Code Ann. Sec. 102(b)(4) (1983). One commentator urges that even a buyer of 100 percent of the stock of a firm should be accorded the protections of the Acts "[i]f this party can prove he intended to be, and thereafter remained, a passive investor." Easley, Recent Developments in the Sale-of-Business Doctrine, supra note 2, 39 Bus.Law. at 971-72. Wholly apart from the oddity of making what a security is depend upon these factors, they raise the prospect of a substantial hearing in many cases simply to determine whether an instrument is a "security."
 
 
 50
 The Seventh Circuit acknowledges the uncertainty that would flow from this investigation, but discounts it. To interpret the Acts as creating private rights of action in favor of "entrepreneurs," the Seventh Circuit has reasoned, "is to go awfully far for the sake of having to make some distinctions." Sutter, 687 F.2d at 202. We are not as placid about this prospect as is the Seventh Circuit. After all, the costs of legal rules accrue not only to the courts but to those members of the public who must structure their affairs accordingly. Counsel must be hired to predict whether the purchase of a large block of stock will render it a security or a non-security. Doubts will be created over whether registrations are necessary. All of this uncertainty has real economic costs. It is one thing, if the sale-of-business doctrine were capable of clear application, to say "caveat emptor" and let the market price reflect that the purchaser no longer has federal protection from fraudulent representations. But it is another thing if the buyer and seller are unable to predict readily whether their instruments are "securities" at all. That uncertainty raises the cost of economic transactions, inhibits the flow of capital, spawns litigation, and in general benefits neither the parties nor the courts.[30]
 
 
 51
 2. Marketability of instruments and necessity for protection
 
 
 52
 A concern related to the uncertainty of application is the marketability of certain favored instruments. The Acts apply not only to the sale of stock on the nationally recognized markets, but to the sale of "notes," "bonds," "debentures," and other instruments sold in non-market transactions. See Marine Bank v. Weaver, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). Certain commercial paper, for example, is illustrative. See note 15 supra. In favoring these widely recognized instruments, Congress reduced the transaction costs associated with their transfer; buyers may rely on the accuracy of representations made without instituting expensive investigations into information over which the seller has knowledge and control, and without demanding a premium price to reflect the risk of fraudulent representations. This protection facilitates the ready sale of instruments in interstate commerce.
 
 
 53
 The sale of a business by means of stock is such a transaction. As the Fifth Circuit has observed,
 
 
 54
 there are special risks involved in the sale of stock in a corporation that might justify special protection. Generally speaking, one who purchases the assets of a business is not liable for its debts and liabilities, while one who purchases the stock in a corporation--a separate legal entity--assumes ownership of a business with both assets and liabilities.... Liabilities, alas, are often the subject of inaccurate or incomplete disclosures.
 
 
 55
 Daily v. Morgan, 701 F.2d 496, 504 (5th Cir.1983).[31] Of course, the buyer can reduce these risks by employing professionals to comb through the most intricate details of the seller's business. But such an investigation is costly and inefficient: the seller controls this information and is already in possession of it; and the buyer's investigation is time-consuming and expensive, thereby raising transaction costs and inhibiting the flow of capital. One of Congress' purposes in singling out the named instruments in the Act was to facilitate such transactions without the ensuing delays, duplication of effort, and expenses associated with the "caveat-stockholder" era of deregulation. See H.R.Rep. No. 1383, 73d Cong., 2d Sess. 4-5 (1934). Denial of the Acts' protection in these circumstances would undermine this Congressional policy.[32]
 
 
 56
 3. Justifiable expectations and value of the bargain
 
 
 57
 A third concern related to the foregoing considerations is the protection of the value of the bargain to the buyer. One of the advantages to the buyer of employing stock to effectuate the sale of a business is the buyer's justifiable reliance on the antifraud provisions of the Acts to reduce transaction costs. Accordingly, the buyer may pay a price for the business that does not reflect a premium for the cost of ensuring the accuracy of all representations made. The Supreme Court has observed that such reliance by the buyer would be reasonable when the stock purchased has the traditional attributes commonly associated with stock ownership. In United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Court reasoned:
 
 
 58
 There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.
 
 
 59
 Id. at 850-51, 95 S.Ct. at 2059-60. In the case of stock, the Court held, those characteristics include the right to receive dividends contingent upon an apportionment of profits; negotiability; capacity for use as collateral; voting rights in proportion to the number of shares owned; and share appreciation. Id. at 851, 95 S.Ct. at 2060.
 
 
 60
 The district court concluded that the stock purchased by Ruefenacht bears these characteristics, and we accept that conclusion for the purposes of this appeal. Consequently, Ruefenacht would have been justified in agreeing on a purchase price that did not include a premium reflecting the risk of fraud. This savings to Ruefenacht represented part of the value of the bargain; and to withhold the Acts' protection in these circumstances would be to deprive the purchaser of that part of the value of the bargain.
 
 
 61
 4. Protection of "investors"
 
 
 62
 Congress unquestionably intended that the Act protect "investors" in the national securities markets.[33] It would, however, be a grave mistake to conclude that this single purpose exhausted Congress' intent. As we have observed, Congress acted with a number of rationales in mind, among them the facilitation of commerce in certain named instruments to reduce transaction costs and enhance the free flow of capital. Thus, we disagree with the Seventh Circuit's view that the function of the federal Acts is limited solely to the protection of "investors," however defined. Sutter, 687 F.2d at 201. But even insofar as the Acts address "investors," there are flaws in the sale-of-business doctrine. The distinction between an "entrepreneur" and an "investor" is hardly obvious. Many investors may elect to participate in the management of a business in order to enhance their return on investment; indeed, in our free-enterprise system that is to be expected. Just why investors who choose to engage in entrepreneurship in order to improve the performances of their investment cease to be "investors," and become instead exclusively "entrepreneurs," is something of a mystery. It seems clear to us that these persons are both investors and entrepreneurs.[34] Even were Congress exclusively concerned with "investors" and not "entrepreneurs"--an assumption with which we strongly disagree--Ruefenacht is certainly an "investor."
 
 
 63
 Moreover, nothing suggests to to us that the Howey test for investment accurately maps the universe of investors with which Congress might have been concerned. The Howey test emerged from the definition of "investment contract" under state "blue sky" laws. As used by state courts and the Supreme Court, this definition was intended to supplement well-defined terms like "stock" and "note." In order to avoid sweeping into the definition of "investment contract" a vast number of joint ventures, partnerships, and other business relationships,[35] the courts confined "investment contract" to a "transaction or scheme" under which persons are led to expect profits "solely from the efforts of" others. Howey, 328 U.S. at 298-99, 66 S.Ct. at 1102-03. This limitation on the definition of investment contract--intended to confine the number of business relationships qualifying as securities under the Acts--had no bearing whatsoever on whether instruments like "stock" were securities. Stock, bonds, notes, and debentures were well-defined instruments; there was no need to import into the definition of such instruments limitations on business relationships that might be investment contracts. Nor would there be any logic in doing so. While Ruefenacht's stock purchase may not have constituted an "investment contract"--a term of art--because of the degree of corporate control he exercised, it certainly constituted an "investment" effectuated by means of the purchase of "stock." It is erroneous to conclude that one who does not enter into an "investment contract" is ipso facto not an "investor." It is doubly erroneous to reason further that such an individual is therefore unprotected by the federal securities laws even though the transaction is effectuated by the purchase of an instrument clearly bearing all the attributes of stock.
 
 5. Arbitrary distinctions
 
 64
 An additional consequence of the sale-of-business doctrine is the welter of unusual distinctions it produces among economic transactions. The sale of all of a corporation's stock to a single buyer by a single seller, for example, is alleged not to constitute the sale of a security; but the same sale to a single buyer by several sellers, each of whom did not formerly exercise control, is alleged to be a securities transaction as to the sellers but not as to the buyer.[36] Similarly, a series of stock sales each insufficient to transfer control from a single seller to a single buyer would presumably constitute the sale of securities; a final sale leaving the buyer with stock ownership greater than 51 percent (and therefore transferring control) may or may not constitute the sale of securities, depending on how the doctrine is applied;[37] and the very same transaction consummated in a single purchase, rather than as a series of step transactions, would presumably not constitute the sale of securities.
 
 
 65
 Such distinctions are essentially arbitrary. The possibility of fraud is neither greater nor less when the purchaser acquires 49 or 51 percent of a business. Nor is the purchaser's capacity to discover fraud greater in one circumstance or the other. The variable of "control" is largely irrelevant to the risk of and capacity to discover fraud. As the Court of Appeals for the Second Circuit has observed, more appropriate considerations might include whether the sale involves a close corporation and whether the transaction takes place over a public market or face to face. Golden v. Garafalo, 678 F.2d at 1146. But close corporations and face-to-face transactions have always been within the compass of the Acts. Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 10, 12, 92 S.Ct. 165, 167, 169, 30 L.Ed.2d 128 (1971); see Glick v. Compagna, 613 F.2d 31, 35 (3d Cir.1979).
 
 
 66
 Moreover, in focusing on terms like "stock," "bond," and "note" in the early part of the definition of security, Congress drew on well-known state-law definitions. See Part III A 2 supra. These terms had a consistency of meaning under state law that did not vary with who owned the instrument at any particular moment, and did not admit of asymmetries between buyer and seller. Rather, they focused on the essential attributes of the instrument: voting rights, redemption rights, the right to participate in dividends, the right to participate in assets upon dissolution, etc. E.g., 8 Del.Code Ann. Sec. 151 (1983); 11 W. Fletcher, Cyclopedia of the Law of Private Corporations Secs. 5083-5085 (1971). Fluctuations in the identity of the instrument were foreign to the notion of stock. The chameleon-like quality of stock under the sale-of-business doctrine is wholly arbitrary with respect to the state-law definitions that are the source of the terms in the 1933 and 1934 Acts.
 
 
 67
 Nor are we persuaded that economic affairs have magnified in complexity since the Seventy-Third Congress, thereby rendering these distinctions any less arbitrary. Of course, affairs of commerce are more sophisticated now than fifty years earlier; but the transaction at issue here is not one that the appellees seek to steer clear of the securities laws because of its peculiar sophistication, and they do not argue that the transaction was unknown in earlier days. This is the simple purchase of 50 percent of a business by means of stock, a transaction as old as the concept of stock itself and certainly known to the drafters of the 1933 and 1934 Acts. If the increased sophistication of today's markets now renders appropriate a variety of distinctions that would have been rejected by the Seventy-Third Congress--an argument whose truth is hardly self-evident--we trust that Congress will amend the Acts accordingly.
 
 6. Adequacy of state-law protection
 
 68
 Finally, it is urged that under the sale-of-business doctrine, the purchaser or seller of a business is not without a remedy for fraud; any remedy would simply lie in a common-law fraud action.[38] We do not believe that the prospect of common-law remedies changes the analysis. The premise that common-law remedies are necessarily adequate in the sale-of-business context is flawed. The defendant, for example, may prove to be insolvent, prompting the plaintiff to seek out solvent defendants among those parties who may be sued by virtue of the absence of privity requirements under federal law.[39] Congress, moreover, did not confine the protection of federal law to instances in which no adequate common-law remedy could be had. The Acts, for example, confer additional benefits on parties victimized by fraud, including the absence of express defenses and certain procedural advantages.[40] In view of the Supreme Court's frequent emphasis on the remedial character of the securities Acts,[41] we do not take these proposed limitations on remedies lightly.
 
 
 69
 In summary, we do not believe that the policies underlying the Acts support the sale-of-business doctrine. To the contrary, the doctrine significantly undermines congressional policies, enhances uncertainty, and increases the likelihood of litigation. We turn now to whether recent Supreme Court authority requires a different conclusion.
 
 B.
 Recent Supreme Court Authority
 
 70
 In United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court held that "stock" held by a tenant in a cooperative apartment building is not a security under the federal Acts. The Court's analysis of the term "stock" admonished us to attend to substance over form:
 
 
 71
 We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," must be considered a security transaction simply because the statutory definition of a security includes the words "any ... stock." Rather we adhere to the basic principle that has guided all of the Court's decisions in this area:
 
 
 72
 "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).
 
 
 73
 See also Howey, supra, at 298, 66 S.Ct. at 1102.
 
 
 74
 421 U.S. at 848, 95 S.Ct. at 2058 (footnote omitted). The instruments held by the tenants, the Court concluded, lacked the attributes commonly associated with stock: the right to participate in dividends, negotiability, capacity to serve as collateral, voting rights in proportion to the number of shares owned, and appreciation in value. Consequently, the Court concluded, as a matter of economic reality the shares in issue were not "stock" within the meaning of the Acts. Id. at 851, 95 S.Ct. at 2060. As we noted earlier, the Supreme Court acknowledged that occasions may arise when the use of a particular name would lead a purchaser justifiably to assume that the federal securities laws apply, adding that "[t]his would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument." Id. at 850-51, 95 S.Ct. at 2059-60.
 
 
 75
 The Court then addressed whether the tenants' shares constituted an "investment contract" under the Howey test, concluding that they did not. Id. at 851-58, 95 S.Ct. at 2060-63. In the course of its investment contract analysis, the Court observed:
 
 
 76
 In considering these [investment contract] claims we again must examine the substance--the economic realities of the transaction--rather than the names that may have been employed by the parties. We perceive no distinction, for present purposes, between an "investment contract" and an "instrument commonly known as a 'security.' " In either case, the basic test for distinguishing the transaction from other commercial dealings is
 
 
 77
 "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Howey, 328 U.S. at 301, 66 S.Ct. at 1104.
 
 
 78
 This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.
 
 
 79
 421 U.S. at 851-52, 95 S.Ct. at 2060 (footnote omitted).
 
 
 80
 The defendants now maintain that the foregoing passages direct that the Howey test is to be applied to all of the defined terms in the Act, including the definition of stock. We do not agree. In its discussion of stock, the Court's admonition to attend to economic reality simply instructed that the label "stock" is not dispositive if the instrument lacks the traditional elements associated with stock ownership. The Court's analysis was clearly not intended to, and did not, apply the Howey test to stock. Nor did the Court direct that an economic reality test be applied to stock other than to determine whether, as a matter of economic reality, the instrument was in fact "stock" as that term has historically been understood. The label of the instrument may be pierced in order to determine whether it indeed bears the indicia of stock ownership. In this case the district court has done so, holding that the "stock which Ruefenacht received contains all the attributes mentioned by the Forman Court as indicating that the transaction did involve a security." App. at 220.
 
 
 81
 In the second portion of the Forman Court's analysis--addressing the definition of "investment contract"--the Court's reference to economic reality prefaced the application of the Howey test. That analysis was entirely proper: the Howey test has for some 40 years been the appropriate metric for gauging whether, as a matter of economic reality, a business relationship constitutes an "investment contract." In no sense was the Court instructing that the Howey test also be applied to stock. Had the Court intended that result, of course, it would have done so. Nor was the Court holding that the same economic reality test applies to the definitions of "stock" and "investment contract." To the contrary, in assessing the economic reality of a stock transaction, we pierce the label and look to the underlying attributes of the instrument. In evaluating an investment contract, we apply the Howey test. Thus, Forman undermines rather than supports the defendants' position.
 
 
 82
 Subsequent Supreme Court authority is also unavailing. In International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1981), the Court held that a non-contributory, compulsory pension plan was not an investment contract. In part the Court reasoned that ERISA supplanted any necessity for coverage by the securities Acts. 439 U.S. at 569-70, 99 S.Ct. at 801-02. The Court expanded on this theme in Marine Bank v. Weaver, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), holding that a certificate of deposit insured by the FDIC did not constitute a security. Again the Court reasoned that the FDIC supplanted any necessity for coverage under the securities laws. 455 U.S. at 558, 102 S.Ct. at 1224. No such regulatory schemes apply in the sale-of-business context. Nor does the language in those opinions speak in favor of applying the investment-contract test to stock. Indeed, the Court's analysis in Weaver paralleled that of Forman: the Court first ascertained that a certificate of deposit is not a "note" or "withdrawable capital share," and only then turned to whether the separate agreement was an "investment contract" under the Howey test. 455 U.S. at 556-60, 102 S.Ct. at 1223-25. Weaver therefore reinforces our interpretation of Forman.
 
 VI. Conclusion
 
 83
 We reject the sale-of-business doctrine as applied to sales of stock. The structure and history of the Acts--particularly Congress' express treatment of short-term notes and its conferral of exemption power on the SEC--counsel against such application. In addition, the doctrine is inconsistent with several policies underlying the Acts: it exacerbates uncertainty; undermines a congressional policy protecting certain instruments in order to reduce transaction costs and facilitate commerce; denies protection to investors simply because those persons are also "entrepreneurs"; deprives purchasers and sellers of part of the value of the bargain; and introduces arbitrary distinctions in the application of the definition of "security." Moreover, the doctrine derives from a misreading of United Housing Foundation, Inc. v. Forman, supra. Forman instructed that we attend to economic reality, in this case whether, as a matter of economic reality, the instrument has the attributes commonly associated with stock; Forman did not direct the application of the Howey test to stock. Finally, the doctrine originated as a limitation on the breadth of the word "note." While the Howey standard might have been an imperfect expedient in the note area--a subject on which we express no opinion--a similar limitation on stock is unnecessary. Stock is a well-defined term, is not issued by consumers, and is not employed by business to finance current operational costs.
 
 
 84
 Thus, we hold that the sale of all or part of a business effectuated by the transfer of stock bearing the traditional incidents of stock ownership is the sale of a "security" under the 1933 and 1934 Acts. The judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion.
 
 JAMES HUNTER, III, Circuit Judge, concurring:
 
 85
 I concur in the majority's conclusion that plaintiff Max A. Ruefenacht ("Ruefenacht") purchased "securities" within the meaning of the Securities Act and Securities Exchange Act when he purchased fifty percent of the shares of Continental Import & Export, Inc. ("Continental") in the form of instruments bearing the name and all the traditional attributes of stock. I note, however, that this court, in Lino v. City Investing Co., 487 F.2d 689 (3d Cir.1973), accorded the "context clause" of the federal securities acts a broader meaning than does the majority in this case. Compare id. at 694-95, with the majority opinion supra, typescript at 30-35.
 
 
 86
 Following Lino, I reach the same conclusion as the majority regarding the particular transaction at issue here. The court below found that Ruefenacht acquired no more than joint control over Continental, that Ruefenacht and Birkle exercised absolute veto power over each other in all important business matters, and that Ruefenacht continued to be a full-time employee of Autobern Trading Co., Inc. "The commercial context of this case," see Lino, 487 F.2d at 685, persuades me to conclude that the district court erred in dismissing Ruefenacht's claims for lack of federal jurisdiction under the securities acts. Accordingly, I join the majority in ordering a remand.
 
 
 
 *
 Honorable Sylvia H. Rambo, United States District Judge for the Middle District of Pennsylvania, sitting by designation
 
 
 [1]
 Securities Act of 1933, 15 U.S.C. Secs. 77a-77bbbb (1982); Securities Exchange Act of 1934, 15 U.S.C. Secs. 78a-78kk (1982)
 
 
 [2]
 See, e.g., Easley, Recent Developments in the Sale-of-Business Doctrine: Toward a Transactional Context-Based Analysis for Federal Securities Jurisdiction, 39 Bus.Law. 929 (1984) [hereafter Easley, Recent Developments in the Sale-of-Business Doctrine ]: Thompson, The Shrinking Definition of A Security: Why Purchasing All of a Company's Stock is Not a Federal Security Transaction, 57 N.Y.U.L.Rev. 225 (1982); Seldin, When Stock is Not a Security: The "Sale of Business" Doctrine under the Federal Securities Laws, 37 Bus.Law. 637 (1982); Karjala, Realigning Federal and State Roles in Securities Regulation Through the Definition of a Security, 1982 U.Ill.L.Rev. 413; FitzGibbon, What is a Security?--A Redefinition Based on Eligibility to Participate in the Financial Markets, 64 Minn.L.Rev. 893 (1980); Hannan & Thomas, The Importance of Economic Reality and Risk in Defining Federal Securities, 25 Hastings L.J. 219 (1974); Long, An Attempt to Return "Investment Contracts" to the Mainstream of Securities Regulation, 24 Okla.L.Rev. 135 (1971); Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 Case W.Res.L.Rev. 367 (1967); Note, Repudiating the Sale-of-Business Doctrine, 83 Colum.L.Rev. 1718 (1983) [hereafter Note, Sale-of-Business Doctrine]; Comment, A Criticism of the Sale of Business Doctrine, 71 Calif.L.Rev. 974 (1983); Comment, Acquisition of Businesses Through Purchase of Corporate Stock: An Argument for Exclusion from Federal Securities Regulation, 8 Fla.St.U.L.Rev. 295 (1980)
 
 
 [3]
 The Second, Fourth, Fifth, and Eighth Circuits have rejected the sale-of-business doctrine. See Daily v. Morgan, 701 F.2d 496, 497-504 (5th Cir.1983); Cole v. PPG Indus., Inc., 680 F.2d 549, 555-56 (8th Cir.1982); Golden v. Garafalo, 678 F.2d 1139, 1140-47 (2d Cir.1982); Coffin v. Polishing Machs., Inc., 596 F.2d 1202, 1204 (4th Cir.), cert. denied, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979)
 The Seventh Circuit has taken the lead in applying the doctrine to the purchase of all or part of the stock of a business. See Sutter v. Groen, 687 F.2d 197, 199-204 (7th Cir.1982); Canfield v. Rapp & Son, Inc., 654 F.2d 459, 463-66 (7th Cir.1981); Frederiksen v. Poloway, 637 F.2d 1147, 1150-54 (7th Cir.), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981). The Ninth, Tenth, and Eleventh Circuits have followed the Seventh Circuit's lead. See Landreth Timber Co. v. Landreth, [1984] Fed.Sec.L.Rep. (CCH) p 99,705 (9th Cir.1984); Christy v. Cambron, 710 F.2d 669, 672 (10th Cir.1983); Kaye v. Pawnee Constr. Co., 680 F.2d 1360, 1366 n. 2 (11th Cir.1982); King v. Winkler, 673 F.2d 342, 344-46 (11th Cir.1982). See also Chandler v. KEW, Inc., 691 F.2d 443, 443-44 (10th Cir.1977).
 On one occasion this court applied the federal securities laws to the sale of 50 percent of the common stock of a close corporation without expressly addressing the applicability of the sale-of-business doctrine. Glick v. Campagna, 613 F.2d 31, 35 (3d Cir.1979). See also Cramer v. General Tel. & Elec. Corp., 582 F.2d 259, 270-73 (3d Cir.1978) (sale of controlling stock interest in corporate subsidiary constitutes sale of securities).
 On the morning of oral argument in this case, the Supreme Court granted certiorari in a Second Circuit case rejecting the sale-of-business doctrine. See Seagrave Corp. v. Vista Resources, Inc., 710 F.2d 95 (2d Cir.1983) (per curiam) (following Golden v. Garafalo, supra ), cert. granted, --- U.S. ----, 104 S.Ct. 2341, 80 L.Ed.2d ---- (1984).
 
 
 [4]
 Gould has impleaded Autobern Trading Corp., Ruefenacht's full-time employer, Bernstein and Stoecklin, associates of Birkle and Ruefenacht, and Lenzenhof GmbH, a German Corporation controlled by Birkle. Birkle and Continental have defaulted
 
 
 [5]
 United Housing Found., Inc. v. Forman, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)
 
 
 [6]
 15 U.S.C. Secs. 77b(1), 78c(a)(10) (1982). These definitions are subject to many important qualifications; the definitions and their qualifications are examined in greater detail in Part III A infra
 
 
 [7]
 E.g., Smith v. Gross, 604 F.2d 639, 642-43 (9th Cir.1979) (per curiam) (earthworms); Miller v. Central Chinchilla Group, Inc., 494 F.2d 414, 416-18 (8th Cir.1974) (chinchillas); SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 478-85 (5th Cir.1974) (cosmetics); SEC v. Glenn W. Turner Enters., 474 F.2d 476, 480-83 (9th Cir.) (self-improvement courses), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973)
 
 
 [8]
 See Exchange National Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1134 (2d Cir.1976) (Friendly, J.) (acknowledging Lino as first appellate holding to narrow the breadth of "note" under the federal Acts)
 
 
 [9]
 In a discussion not entirely free of self-defining terms, the Fifth Circuit characterized a "note" under the federal Acts as either (1) "offered to some class of investors," (2) "acquired for speculation or investment," or (3) exchanged to "obtain investment assets, directly or indirectly." McClure v. First Nat'l Bank of Lubbock, 497 F.2d 490, 493-94 (5th Cir.1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); see also Bellah v. First National Bank of Hereford, 495 F.2d 1109, 1111-13 (5th Cir.1974) (adopting distinction between "investment" and "commercial" loan)
 
 
 [10]
 Great Western Bank & Trust Co. v. Kotz, 532 F.2d 1252, 1257 (9th Cir.1976). Six factors bore on the Ninth Circuit's analysis: (1) "time," (2) "collateralization," (3) "form of the obligation," (4) "circumstances of issuance," (5) "relationship between the amount borrowed and the size of the borrower's business," and (6) "contemplated use of the proceeds." Id. at 1257-58 (emphasis omitted)
 
 
 [11]
 15 U.S.C. Secs. 77c(a)(3), 77q(c) (1982)
 
 
 [12]
 15 U.S.C. Sec. 78c(a)(10) (1982). See Part III A infra
 
 
 [13]
 Judge Friendly wrote:
 One can readily think of many cases where [the context requires that a note is not within the Act]--the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized). When a note does not bear a strong family resemblance to these examples and has a maturity exceeding nine months, Sec. 10(b) of the 1934 Act should generally be held to apply.
 544 F.2d at 1138 (footnote omitted). Recently the Second Circuit added a new member to this family: notes evidencing loans by commercial banks for current operations. See Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 939 (2d Cir.1984) (Friendly, J.).
 
 
 [14]
 See note 33 infra
 
 
 [15]
 The SEC regards commercial paper as exempt from the registration provisions of the 1933 Act, see 15 U.S.C. Sec. 77c(a)(3) (1982), only if the paper is:
 prime quality negotiable paper of a type not ordinarily purchased by the general public, that is, paper issued to facilitate well-recognized types of current operational business requirements and of a type eligible for discounting by Federal Reserve Banks.
 Securities Act Release No. 4412, 26 Fed.Reg. 9158, 9159 (1961); see 17 C.F.R. Sec. 231.4412 (1983). Commercial paper is not exempt from the antifraud provisions of the 1933 Act. See 15 U.S.C. Sec. 77q(c) (1982); Part III A infra.
 Most courts have applied the criteria of Release 4412 to the 1934 Act exemption as well. E.g., Mallinckrodt Chem. Works v. Goldman, Sachs & Co., 420 F.Supp. 231, 240 (S.D.N.Y.1976); Alton Box Board Co. v. Goldman, Sachs & Co., 418 F.Supp. 1149, 1157 (E.D.Mo.1976) (citing Levy infra ), rev'd on other grounds, 560 F.2d 916 (8th Cir.1977); Franklin Savings Bank v. Levy, 406 F.Supp. 40, 43-44 (S.D.N.Y.1975), rev'd on other grounds, 551 F.2d 521, 527-29 (2d Cir.1977); Welch Foods v. Goldman, Sachs & Co., 398 F.Supp. 1393, 1397-98 (S.D.N.Y.1974). See generally Sonnenschein, Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 35 Bus.Law. 1567, 1574 & nn. 27-28, 1586-87 & n. 86 (1980); Note, The Commercial Paper Market and the Securities Acts, 39 U.Chi.L.Rev. 362, 380-401 (1972) [hereafter Note, Commercial Paper ].
 
 
 [16]
 See Sonnenschein, supra note 15, 35 Bus.Law. at 1595 & n. 131; Coffey, supra note 2, 18 Case W. Res.L.Rev. at 381-403; Hannan & Thomas, supra note 2, 25 Hastings L.J. at 219-53
 
 
 [17]
 E.g., Daily v. Morgan, 701 F.2d 496 (5th Cir.1983); Cole v. PPG Indus., Inc., 680 F.2d 549 (8th Cir.1982); Golden v. Garafalo, 678 F.2d 1139 (2d Cir.1982); Coffin v. Polishing Machs., Inc., 596 F.2d 1202 (4th Cir.), cert. denied, 444 U.S. 8868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979). For incisive academic commentary, see Note, Sale-of-Business Doctrine, supra note 2, 83 Colum.L.Rev. 1718 (1983); Comment, A Criticism of the Sale of Business Doctrine, 71 Calif.L.Rev. 974 (1983)
 
 
 [18]
 See, e.g., Thompson, supra note 2, 57 N.Y.U.L.Rev. at 253-61; Seldin, supra note 2, 37 Bus.Law. at 661-62
 
 
 [19]
 See McGrath v. Zenith Radio Corp., 651 F.2d 458, 467-68 n. 5 (7th Cir.), cert. denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981)
 
 
 [20]
 Until recently, courts expressed little doubt that the sale of 100 percent of the stock of a business (and a fortiori less than 100 percent) constituted the sale of a "security" under the Acts. See Occidental Life Ins. Co. v. Pat Ryan Assocs., Inc., 496 F.2d 1255, 1261-63 (4th Cir.), cert. denied, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); Spencer Cos. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir.1973) (denying preliminary injunction but assuming stock was a security); Alberto-Culver Co. v. Scherk, 484 F.2d 611, 615 (7th Cir.1973) rev'd on other grounds sub nom. Scherk v. Alberto-Culver Co., 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); Walling v. Beverly Enters., 476 F.2d 393, 395 (9th Cir.1973) (exchange of all common stock)
 The parties appear to have assumed that the sale of 100 percent of the stock of a firm constitutes the sale of a "security" in Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). There the Supreme Court doubted whether a non-purchaser/non-seller (Manhattan Casualty Co.) had standing to invoke the Acts, see id. at 13-14 n. 10, a question later settled in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). No party at any stage of the litigation, however, appears to have questioned that the stock constituted a "security."
 
 
 [21]
 See Note, Commercial Paper, supra note 15, 39 U.Chi.L.Rev. at 384. Accordingly, the Commission requires that, in order to qualify for the section 3 exemption to registration, short-term commercial paper be of prime quality and of a kind not marketed to the general public. See note 15 supra
 
 
 [22]
 A Senate Report describes these definitions as "substantially the same." S.Rep. No. 792, 73d Cong., 2d Sess. 14 (1934). See United Housing Found., Inc. v. Forman, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975); Tcherepnin v. Knight, 389 U.S. 332, 335-36, 88 S.Ct. 548, 552-53, 19 L.Ed.2d 564 (1967)
 
 
 [23]
 The subtle distinctions in short-term note coverage under the Acts is examined in Note, Commercial Paper, supra note 15, 39 U.Chi.L.Rev. at 380-401; and in Exchange National Bank, supra, 544 F.2d at 1131-32. See note 15 supra
 
 
 [24]
 Section 3(a)(12) as amended provides:
 The term "exempted security" or "exempted securities" includes ... such other securities ... as the Commission may, by such rules and regulations as it deems consistent with the public interest and the protection of investors, either unconditionally or upon specified terms and conditions or for stated periods, exempt from the operation of any one or more provisions of this chapter which by their terms do not apply to an "exempted security" or to "exempted securities".
 15 U.S.C. Sec. 78c(a)(12) (1982).
 
 
 [25]
 Cf. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 733-34, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975) (noting distinction between "purchase or sale " in Sec. 10(b) of 1934 Act and "offer or sale" in Sec. 17(a) of 1933 Act, and stating, "When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly."); see also Touche Ross & Co. v. Redington, 442 U.S. 560, 572, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979); Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979)
 
 
 [26]
 See also Daily v. Morgan, 701 F.2d 496, 502 (5th Cir.1983); Golden v. Garafalo, 678 F.2d 1139, 1146-47 (2d Cir.1982)
 
 
 [27]
 The commentators are in general agreement with this interpretation. See Sonnenschein, supra note 15, 35 Bus.Law. at 1577-78 & n. 44; Hannan & Thomas, supra note 2, 25 Hastings L.J. at 277-79; 2 L. Loss, Securities Regulation 1698, 1705 (2d ed. 1961); 4 L. Loss, Securities Regulation 2485 (2d ed. Supp. 1969). The Commission also has interpreted the "context clauses" to refer to the context in which the defined terms appear in the Acts. See 1 L. Loss, Securities Regulation 215, 524-25, 533, 642-43 (2d ed. 1961); 2 id. at 1696 n. 33. Moreover, the Supreme Court too has interpreted the clause in this fashion. See SEc v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969):
 Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the 1933 and the 1934 Acts preface their lists of general definitions with the phrase "unless the context otherwise requires."
 Id. at 466. See also note 29 infra.
 
 
 [28]
 The Seventh Circuit has espoused this "factual context" position. See Emisco Inds., Inc. v. Pro's Inc., 543 F.2d 38, 39 (7th Cir.1976); C.N.S. Enters., Inc. v. G & G Enters., Inc., 508 F.2d 1354, 1357-62 (7th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975)
 
 
 [29]
 See, e.g., Marine Bank v. Weaver, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), holding that a certificate of deposit was not a security under the federal securities Acts because it enjoyed sufficient protection under the banking laws. Id. at 558-59, 102 S.Ct. at 1224-25. Although the Court relied in part on the context clause, its holding was independently supported by the legislative history and structure of the banking laws and securities Acts
 
 
 [30]
 See Daily v. Morgan, 701 F.2d at 503; Golden v. Garafalo, 678 F.2d at 1145-46; Note, Sale-of-Business Doctrine, supra note 2, 83 Colum.L.Rev. at 1741-44
 
 
 [31]
 See also Exchange National Bank, 544 F.2d at 1137 ("While banks are in a favored position to obtain disclosure, the target of [the Acts] is fraud, which a bank's ability to obtain disclosure cannot always prevent."); Occidental Life Ins. Co. v. Pat Ryan & Assocs, Inc., 496 F.2d 1255, 1263 (4th Cir.) ("In one sense the large investor has a more pressing need for protection to the extent that he has expended a greater amount of his resources."), cert. denied, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); Mifflin Energy Sources, Inc. v. Brooks, 501 F.Supp. 334, 336 (W.D.Pa.1980); Titsch Printing, Inc. v. Hastings, 456 F.Supp. 445, 449 (D.Colo.1978)
 
 
 [32]
 Thus, we are unpersuaded by the argument that a sophisticated buyer with substantial resources is in a position to detect fraud and therefore undeserving of coverage. This argument misses the point. Of course the buyer may hire accountants and attorneys to scrutinize the seller's business; however, it is more efficient for the seller to warrant the accuracy of representations made than for the buyer to expend substantial amounts of time and money unearthing facts already known to the seller. This efficiency is one of the purposes of the Acts and promotes the marketability of securities and free flow of capital
 
 
 [33]
 For a review of some of the legislative history referring to the protection of investors in the national markets, see Daily v. Morgan, 701 F.2d at 500-02 n. 5; Sutter v. Groen, 687 F.2d at 201
 
 
 [34]
 See Daily v. Morgan, 701 F.2d at 503; Golden v. Garafalo, 678 F.2d at 1146 ("in truth, purchasers of a business rightly regard themselves as investors as well as managers"); Note, Sale-of-Business Doctrine, supra note 2, 83 Colum.L.Rev. at 1738-39
 The Seventh Circuit acknowledges that purchasers may be both investors and entrepeneurs but assumes that investment must constitute the "purchaser's main purpose." Sutter, 687 F.2d at 203 (emphasis added). We see no evident source in the Acts for the requirement that investment must be a "main purpose" rather than a "subsidiary" purpose. Moreover, this interpretation opens a new avenue of inquiry into gradations of the purchaser's intent; we doubt that lengthy pretrial discovery and hearings on such subtleties as whether the purchaser's "main" or "subsidiary" intent was "investment" promotes the purposes of the Acts. Nor do we believe the inquiry a fruitful one: the purchaser obviously intends both to invest and to manage.
 
 
 [35]
 See, e.g., Goodwin v. Elkins & Co., 730 F.2d 99, 103 (3d Cir.1984); id. at 112 (Seitz, C.J., concurring); id. at 114 (Becker, J., concurring) (partnership agreement did not constitute an investment contract under the terms of the agreement)
 
 
 [36]
 McGrath v. Zenith Radio Corp., 651 F.2d 458, 467-68 n. 5 (7th Cir.), cert. denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981); see Seldin, supra note 2, 37 Bus.Law. at 679-81
 
 
 [37]
 The final sale itself arguably would not constitute the sale of a security because it transferred control to the buyer. Similarly, all prior sales may not constitute sales of securities if they were effectively part of a single step transaction. On the other hand, it is plausible that each of the sales would constitute the sale of securities because each comprised less than 50 percent of the business. We hesitate to speculate on the proper application of the doctrine in these circumstances
 
 
 [38]
 See Thompson, supra note 2, 57 N.Y.U.L.Rev. at 241-43
 
 
 [39]
 Cf. Sonnenschein, supra note 15, 35 Bus.Law. at 1578
 
 
 [40]
 See generally 1 L. Loss, supra note 28, at 22; 3 id. at 1430-34; Note, Sale-of-Business Doctrine, supra note 2, 83 Colum.L.Rev. at 1739 n. 12, 1742; Note, Commercial Paper, supra note 15, 39 U.Chi.L.Rev. at 401 & n. 264
 
 
 [41]
 See Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 689-90, 74 L.Ed.2d 548 (1983) (availability of express remedy under Sec. 11 of 1933 Act does not preclude action under Sec. 10b of 1934 Act); Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); see Lino v. City Investing Co., 487 F.2d 689, 692 (3d Cir.1973)