Anthony A. SUTTER, Plaintiff-Appellant,

v.

E. B. GROEN and Naomi Groen, Defendants-Appellees.

No. 81–2876.

United States Court of Appeals, Seventh Circuit.

Argued May 4, 1982.

Decided Aug. 20, 1982.

Richard L. Steagall, Nicoara & Steagall, Peoria, Ill., for plaintiff-appellant.

Franklin L. Renner, Bartley, Fraser, Parkhurst, Hession & Renner, Peoria, Ill., for defendants-appellees.

Before BAUER and POSNER, Circuit Judges, and LARSON,* Senior District Judge.

POSNER, Circuit Judge.

The complaint in this federal securities case alleges that the plaintiff, Sutter, owns 70 percent of the common stock of Happy Radio, Inc., a corporation whose only significant asset (apart from the capital contributed by its shareholders) is an agreement with the defendants, Mr. and Mrs. Groen, the sole shareholders of Bret Broadcasting Corporation, to purchase all of the Groens' stock in Bret Broadcasting over a 12-year period, during which Happy Radio has the right to manage Bret. The complaint alleges that the Groens overstated Bret Broadcasting's earnings in order to induce Happy Radio to pay an inflated price for Bret Broadcasting's stock and investors to buy stock in Happy Radio, and that Sutter was induced by these misrepresentations to buy stock in Happy Radio which is now worthless.

* Of the District of Minnesota.

Count I of the complaint alleges that the defendants' conduct violated Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5. Rule 10b–5, promulgated in 1942 pursuant to section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which authorizes the Commission to promulgate rules against deceptive practices "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered," forbids misrepresentations and related practices "in connection with the purchase or sale of any security." The federal courts have jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. § 1331 to adjudicate alleged violations of the rule.

Count II of the complaint alleges that the defendants' conduct violated state tort law. It bases federal jurisdiction on the doctrine of pendent jurisdiction and on 28 U.S.C. § 1332 (diversity of citizenship).

The defendants moved to dismiss Count I for failure to state a claim, relying on *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir. 1981), and Count II for want of federal jurisdiction, pointing out that a pendent claim is invariably dismissed when the federal claim to which it is pendent is dismissed before trial, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), and attaching an affidavit to prove that Sutter and the Groens are citizens of Illinois, so that jurisdiction cannot be based on diversity either. The district court treated the motion as one for summary judgment, granted it, and dismissed the complaint. Sutter appeals.

Although the judgment entered by the district court purports to dismiss the entire action, not just Count I, the district court's opinion contains no reference to Count II, or indeed to any claim other than the Rule 10b–5 claim; and the district court's docket sheet indicates that pretrial discovery is continuing. Concerned that we might not have jurisdiction over this appeal, we issued an order on June 8, 1982, asking the district judge to tell us whether he had meant to dismiss the complaint in its entirety, and if not whether he wanted to certify his dismissal of Count I for immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure. He has responded by advising us that he had not intended to dismiss any diversity claim and by certifying his dismissal of Count I for an immediate appeal. His Rule 54(b) certification is valid even though made after the filing of the notice of appeal in this court. *Local P–171, Amalgamated Meat Cutters & Butcher Workmen of North America v. Thompson Farms Co.*, 642 F.2d 1065, 1068 (7th Cir. 1981).

The issue on the merits is whether Sutter has succeeded in alleging "the purchase ... of any security"; if he has not, he cannot invoke Rule 10b–5. The complaint mentions two purchases: Happy Radio's purchase of 100 percent of the stock of Bret Broadcasting from its owners, the Groens; and Sutter's purchase of stock in Happy Radio. The first is squarely within the scope of the sale of business doctrine adopted by this circuit in *Frederiksen v. Poloway, supra.* Under that doctrine, which has been adopted by two other circuits as well, see *Chandler v. Kew*, [1979] CCH Fed.Sec.L.Rep. ¶ 96,996 (10th Cir. 1977); *King v. Winkler*, 673 F.2d 342 (11th Cir. 1982), the sale of an entire business to a single purchaser is not considered a "security" transaction for purposes of federal securities law even if it is accomplished by a sale of stock or other securities. We could thus reject the claim that Happy Radio's purchase of 100 percent of the common stock of Bret Broadcasting provides a basis for invoking Rule 10b–5 with a citation to *Frederiksen*, or to *Canfield v. Rapp & Son, Inc.*, 654 F.2d 459, 464–65 (7th Cir. 1981), which reaffirmed *Frederiksen*. But instead we have decided to consider the doctrine yet again, this time in light of the Second Circuit's emphatic rejection of it (though by only a 2 to 1 vote) in *Golden v. Garafalo*, 678 F.2d 1139 (2d Cir. 1982), and the Supreme Court's recent decision in *Marine Bank v. Weaver*, — U.S. —, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). Both decisions postdate *Canfield*.

The term "security" as used in the Securities Exchange Act is defined in section 3(a)(10) of the Act, 15 U.S.C. § 78c(a)(10), as follows: "Unless the context otherwise requires . . . , [t]he term 'security' means any note, stock, treasury stock, bond, debenture . . . or in general, any instrument commonly known as a 'security' . . . ." (The corresponding definition in the Securities Act of 1933, 15 U.S.C. § 77b(1), is nearly identical, but we shall confine our attention in this opinion to the 1934 Act.) Read literally, this definition embraces the common stock of Bret Broadcasting Corporation; the question is whether it should be read literally. There is considerable judicial authority against doing so. Though most of the early cases involved promissory notes (see *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1133–36 (2d Cir. 1976), for a review of those cases), *United Housing Foundation v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), on which this court relied heavily in *Frederiksen*, involved stock, albeit stock in a nonprofit cooperative housing corporation. To obtain a cooperative apartment from the corporation the would-be tenant had to purchase a fixed number of shares for each room desired, at a fixed price per share; and he could sell his shares only to a new occupant of the same apartment or back to the corporation, and only at the price at which he had bought the shares plus a pro rata share of the amortization of the mortgage on the apartment complex. The stock thus lacked the most important characteristics of corporate stock and in particular had no investment value—it could yield its owners neither dividends nor appreciation. It was really just a deposit recoverable from either the landlord or the succeeding tenant.

The Supreme Court held that it was not a "security." But the Second Circuit in *Golden* distinguished *Forman* from *Frederiksen*, pointing out that the question in *Forman* had been how to characterize an unconventional instrument—something called "stock" but lacking the essential attributes of corporate stock—while the sale in *Frederiksen* (as in the present case) was of garden-variety common stock although the purpose was to acquire an entire business rather than to invest passively. On this view, *Forman* merely used the catch-all definitional phrase in section 3(a)(10)—"any instrument commonly known as a 'security' "—to limit the range of meanings otherwise assignable to the specifically enumerated instruments, such as "stock."

This may take care of *Forman*, but *Marine Bank v. Weaver, supra*, provides, we think, solid support for *Frederiksen*. At issue in *Weaver* was a six-year seven-and-one-half percent certificate of deposit issued by a bank and insured by the Federal Deposit Insurance Corporation. Such a certificate of deposit is a type of promissory note—and "note" of course is one of the instruments specifically listed in section 3(a)(10)—and it is also what is "commonly known as a 'security.' " It is an unusually safe security, but no safer than a Treasury bill, which like other U. S. government obligations is also commonly known as a security. Yet the Supreme Court held that the bank's certificate of deposit was not a security under the Securities Exchange Act. The Court reasoned that "it is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws." —— U.S. at ——, 102 S.Ct. at 1225, 71 L.Ed.2d at 416. The Court got around the seemingly uncompromising statutory language by treating the word "context" in the introductory clause of section 3(a)(10) as having reference to the economic as well as linguistic context. *Forman* had dealt with this problem more directly by remarking—we paraphrase—that in interpreting statutes as in interpreting Biblical commands, the letter killeth but the spirit giveth life. See 421 U.S. at 849, 95 S.Ct. at 2059.

The method that the Supreme Court used in *Weaver* to decide whether a securities transaction is within the Securities Exchange Act is not limited to certificates of

deposit insured by the FDIC. The Court disregarded the literal meaning of section 3(a)(10) in order to avoid casting the net of Rule 10b–5 liability farther than the Congress that enacted the Securities Exchange Act can reasonably be thought to have wanted it cast; it would be inconsistent to subject every sale of common stock to Rule 10b–5 regardless of legislative purpose. Of course if Congress lays down a flat rule for the courts to follow they have no right to cut it down to fit their conception of legislative purpose. *Western Transport Co. v. Wilson & Co.*, 682 F.2d 1227, 1230–1231 (7th Cir. 1982). But there is no indication that Congress wanted to do this in the Securities Exchange Act. It defined "security" very broadly, but presumably to prevent the financial community from evading regulation by inventing new types of financial instruments rather than to prevent the courts from interpreting the Act in light of its purposes.

So we may and perhaps in light of *Weaver* must ask whether the sale of 100 percent of the common stock of Bret Broadcasting was the kind of transaction that Congress, if it had foreseen the promulgation of Rule 10b–5, would have wanted brought within its scope. We must ask in other words what class of people Congress wanted to protect by enacting the Securities Exchange Act, and in particular section 10(b). The answer is not in doubt: investors. In his message to Congress of February 9, 1934, President Roosevelt recommended "the enactment of legislation providing for the regulation by the Federal Government of the operations of exchanges dealing in securities and commodities for the protection of investors, for the safeguarding of values, and so far as it may be possible, for the elimination of unnecessary, unwise, and destructive speculation." S.Rep.No.792, 73d Cong., 2d Sess. 2 (1934). These are investor interests. The Report of the Senate Committee on Banking and Currency describes the objective of the legislation as follows: "The three principal problems with which the bill deals are the excessive use of credit for speculation, the unfair practices employed in speculation, and the secrecy surrounding the financial condition of corporations which invite the public to purchase their securities." S.Rep.No.792, *supra*, at 5. The victims of these (real or imagined) evils are investors. The Committee's report contains a chorus of references to "disastrous results to investors," "tremendous losses to the investing public," "losses incurred in speculative transactions," "severe financial losses ... sustained by investors," "the exploitation of the investor," and on and on in this vein. *Id.* at 4, 6–7, 11–12. No other protected class is mentioned; entrepreneurs are not mentioned. The Report states that section 10(b) authorizes the Securities and Exchange Commission to promulgate rules prohibiting "other manipulative or deceptive practices which it finds detrimental to the interests of the investor." *Id.* at 18.

There is a clear difference in principle between an investor and an entrepreneur; and while sometimes a person is both at once, often he is one or the other. A judge who owns IBM stock is an investor but not an entrepreneur; the corner grocer is a food entrepreneur rather than an investor in the food business, though a conglomerate corporation that owned a chain of grocery stores might be both. The intellectual patrimony of the Securities Exchange Act includes Berle and Means' influential book (published two years before the Act was passed), The Modern Corporation and Private Property (1932), which made "the separation of [passive stock] ownership and [active managerial] control" in the modern corporation (see, e.g., *id.* at 120) a rallying cry for reformers. And while the policy implications that Berle and Means drew from this separation are controversial, the distinction itself—a parallel to our suggested distinction between "investor" and "entrepreneur"—is accepted even by their critics. See, e.g., Alchian & Demsetz, *Production, Information Costs, and Economic Organization*, 62 Am.Econ.Rev. 777, 789 n. 14 (1972).

Applying the distinction to this case we note that if Happy Radio had purchased a radio transmitter from Bret Broadcasting and had later discovered that the Groens

had misrepresented the value of the transmitter, Happy Radio could not complain that it had been tricked into making a bad investment in any sense relevant to the Securities Exchange Act. Even if it had purchased all of Bret's assets it could not complain that it had been tricked into making a bad *investment.* The entrepreneurial intention—to buy assets to manage, rather than to rent capital to those who want to manage—would be no less just because Happy Radio took over Bret Broadcasting's business by means of a stock rather than an asset acquisition. Either way the purpose would be to put Happy Radio into the business of managing a broadcasting company rather than to rent capital to an entrepreneur. The stock purchase agreement is explicit that Happy Radio's right to manage Bret Broadcasting's properties was to vest immediately rather than at the completion of Happy Radio's installment payments to the Groens. This is further evidence, if any is needed, that while the shareholders in Happy Radio may conceivably be mere renters Happy Radio itself is an entrepreneur.

▮ It is of course easy to imagine intermediate cases, where the distinction between a purchase for investment and a purchase for control becomes fuzzy, though apparently it has proved a workable distinction in other areas of law—for example under the "investment exception" in section 7 of the Clayton Act. 15 U.S.C. § 18; see *United States v. Tracinda Investment Corp.*, 477 F.Supp. 1093, 1098–1102 (C.D.Cal. 1979). The problem of drawing lines was the principal reason given by the Second Circuit in *Golden* for rejecting the sale of business doctrine. See 678 F.2d at 1145–46. We agree that the costs of administering legal rules are a proper concern in designing those rules. But rarely will a net saving in those costs be produced by expanding liability, since even if the legal standard will be simpler and therefore cheaper to apply in each case the number of potential cases in which it will be applied will be greater. And if there were some net cost savings we doubt they could justify expanding liability to reach substantive evils far outside the scope of the legislature's con-

cern. It is doubtful that rules promulgated under section 10(b) of the Securities Exchange Act of 1934 were intended to create private rights of action at all. See *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 729–30, 737, 95 S.Ct. 1917, 1922, 1926, 44 L.Ed.2d 539 (1975); *id.* at 759, 95 S.Ct. at 1936 (concurring opinion); 1 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 2.4(121) (1982). It is certain they were not intended to create private rights of action in favor of entrepreneurs rather than investors. To interpret them as doing so is to go awfully far for the sake of avoiding having to make some distinctions. And we recall Justice Holmes' admonition not to "trouble ourselves with the thought that my view depends upon differences of degree. The whole law does so as soon as it is civilized. . . . [B]etween the variations according to distance that I suppose to exist, and the simple universality of the rules in the Twelve Tables, or the Leges Barbarorum, there lies the culture of two thousand years." *LeRoy Fibre Co. v. Chicago, Milwaukee & S. P. Ry.*, 232 U.S. 340, 354, 34 S.Ct. 415, 418, 58 L.Ed. 631 (1914) (separate opinion).

Actually, there is no issue of degree with regard to the sale of the Groens' stock to Happy Radio. It was a sale of 100 percent of the common stock of Bret Broadcasting, and the Groens retained no role in the company—not even under an employment contract, as in *Frederiksen.* But the picture changes when we turn to the second stock transaction on which Sutter is trying to hang his Rule 10b–5 claim: his purchase of stock in Happy Radio, allegedly in reliance on the Groens' misrepresentations concerning the value of Bret Broadcasting. True, if he created Happy Radio as his corporate vehicle for acquiring the assets of Bret Broadcasting—if he was the entrepreneur, and Happy Radio a device for limiting his personal liability, avoiding some taxes, or raising additional money from investors to help swing the deal—then the transaction was just a step on the way to Sutter's taking over Bret Broadcasting and the sale of business doctrine would apply. But it

would not apply if Sutter is just an investor in Happy Radio; if, even before he came on the scene, the officers and directors of Happy Radio wanted to buy Bret Broadcasting, and the Groens, realizing they could get a higher price for their stock if they induced potential investors such as Sutter to purchase stock in Happy Radio at a high price, exaggerated the value of Happy Radio's right to acquire Bret Broadcasting and thereby induced Sutter to make a large, passive investment in Happy Radio.

■ The allegations of the complaint are consistent with either of these hypotheses and equally with the hypothesis that Sutter was an investor *and* an entrepreneur—seeking a return both from exercising entrepreneurial and managerial skills in operating Bret Broadcasting's business, and from renting capital to Happy Radio to obtain Bret Broadcasting's assets. This would be that exquisitely mixed case that the Second Circuit despaired of being able to decide. We think despair is premature; and for the guidance of the district court on remand adopt the following presumption to deal with cases where the purchaser has acquired a substantial bloc of the stock of the corporation but less than 100 percent. If, as in this case (the complaint alleges that Sutter owns 70 percent of the common stock of Happy Radio), the purchaser already has, or by the purchase in question acquires, more than 50 percent of the common stock of the corporation, his purpose in purchasing the stock will be presumed to have been entrepreneurship rather than investment. The presumption can be rebutted by showing that the purchaser's main purpose was investment.

The difference between owning more than 50 percent of a corporation's common stock and owning 50 percent or less is fundamental. A more than 50 percent stockholder can elect a majority of the board of directors. He therefore controls the corporation—regardless of the distribution of the remaining shares—except with regard to a few decisions, involving basic alterations in corporate structure, which may require more than a bare majority to make. See,

e.g., Ill.Rev.Stat.1981, ch. 32, § 157.64. But the degree to which someone who owns 50 percent or less controls the corporation depends on the distribution of the remaining shares. If he owns 49 percent and one other person owns the other 51 percent, he does not have control, or even a veto on most matters. In fact many closely held corporations have an entrepreneurial shareholder who owns a bare majority of the stock and a passive investor who contributes the capital of the corporation and receives in return a large minority share—sometimes 49 percent. What is unusual enough to warrant a negative presumption is for someone who does not want to control a corporation to buy a controlling share of its stock. Since a bloc of stock large enough to confer control of the company will usually command a higher price per share than a smaller bloc—the difference in price being the well known "control premium"—someone who does not want control would be foolish to buy such a bloc.

Our presumption is therefore consistent with the distinction between entrepreneurial and investment objectives in purchasing stock, a distinction fundamental to determining the intended reach of the Securities Exchange Act and of the rules promulgated under the Act, such as Rule 10b–5. It makes the "economic reality" test of *Frederiksen*, see 637 F.2d at 1152, a little more concrete and thereby meets the Second Circuit's concern with the difficulty of drawing lines. We need not consider in this case the possible application of the sale of business doctrine to purchases of 50 percent of a corporation's stock (see *Oakhill Cemetery of Hammond, Inc. v. Tri-State Bank*, 513 F.Supp. 885, 890 (N.D.Ill.1981)), or less.

As Sutter is in fairness entitled to an opportunity to rebut the presumption we have just announced, we must vacate the district court's judgment dismissing Count I of the complaint unless the alternative ground that the Groens present for affirming the judgment—that Sutter lacks standing to complain about their alleged violations of Rule 10b–5—has merit. The Groens argue that with regard to Happy

Radio's purchase of the Groens' stock, Sutter's only remedy is to bring a derivative suit on behalf of Happy Radio, see Fed.R. Civ.P. 23.1; *Goldberger v. Baker*, 442 F.Supp. 659, 663 (S.D.N.Y.1977), which he has not done. And they argue that Sutter's purchase of stock in Happy Radio is outside the scope of Rule 10b–5 because it occurred after the stock purchase agreement between Happy Radio and the Groens was signed. Neither of these arguments is developed in the Groens' brief; neither was addressed by the district court in its decision; and the second relies on an alleged fact—the timing of Sutter's purchase in relation to the stock purchase agreement—that is not in the record. We leave these arguments to be considered by the district judge on remand should they become relevant to his further consideration of this case, and simply offer our tentative view that the first argument is irrelevant in light of our holding that the sale of business doctrine places the sale of the Groens' stock to Happy Radio outside the reach of Rule 10b–5, and that the second is unsound because it confuses the date of the stock purchase agreement with the date of the alleged misrepresentations. If Sutter was induced to purchase stock in Happy Radio by the Groens' misrepresentations, we do not understand why he lacks standing to complain of a Rule 10b–5 violation if there was one. See *Sargent v. Genesco, Inc.*, 492 F.2d 750, 751, 762–64 (5th Cir. 1974).

There is one more loose end to tie up. Although the judgment dismissing the complaint does not refer to Sutter's pendent claim, in its response to our order of June 8 the district court indicated that it had intended to dismiss that claim along with Sutter's Rule 10b–5 claim. We assume the district court will allow that claim to be reinstated, at least provisionally, in the further proceedings to determine whether Sutter's purchase of stock in Happy Radio allows him to maintain this suit under Rule 10b–5. Of course, if Sutter's diversity allegations are correct, there is no need to invoke the doctrine of pendent jurisdiction to support Count II; but they are contested, so an alternative jurisdictional basis, such as pendent jurisdiction, may become important.

VACATED AND REMANDED.