**CROWNAIR SYSTEMS, INC.,**
**Original Plaintiff,**

**Dorado Wings, Inc., George R. McCanless, Walter P. Strycker, and Kenneth N. Pontikes, Rule 19 Plaintiffs,**

v.

**Henry WOLF and Pannell Kerr Forster, Defendants.**

**Nicholas APOSTOL, Defendant, Counter-claimant and Third Party Plaintiff,**

v.

**George R. McCANLESS, Walter P. Strycker, and Kenneth N. Pontikes, Third Party Defendants.**

**Civ. No. 82–2638 HL.**

United States District Court, D. Puerto Rico.

Dec. 11, 1984.

Salvador Antonetti, Fiddler, González & Rodriguez, San Juan, P.R., Norman L. Faber, Hall, Dickler, Lawler, Kent & Howley, New York City, for Crownair Systems, Inc.

Francisco Fernandez Carbia, Dubon, Dubon & Vazquez, San Juan, P.R., for Pannell Kerr Forster.

Victor M. Pons, Jr., Sweeting, Pons, Gonzalez & Cestero, Cancio, Nadal & Rivera, San Juan, P.R., for Henry Wolf.

Richard A. Lee, Arturo Diaz, San Juan, P.R., for Nicholas Apostol.

## OPINION AND ORDER

LAFFITTE, District Judge.

Defendants Henry Wolf ("Wolf") and Nicholas Apostol ("Apostol") have moved to dismiss the complaint for lack of subject matter jurisdiction on the ground that, as a matter of law, the complaint fails to state a claim for relief under the Securities Act of 1933 ("the 1933 Act") and the Securities Exchange Act of 1934 ("the 1934 Act"). Defendant Pannel Kerr Forster ("PFK") has cross-moved to dismiss the complaint on the same grounds.

Defendants claim that under the so-called "sale of business doctrine", the sale of 100% of the stock of a corporation pursuant to the acquisition of the business by a purchaser does not involve the sale or purchase of a "security" as defined in the Federal Securities Laws. This issue apparently has not been decided by any of the courts in this Circuit, and thus is a matter of first impression.[1]

## FACTS

In or around January, 1981 Wolf, who owned all of the capital stock of Dorado Wings, Inc. ("Dorado Wings"), a Puerto Rico corporation which operated a commercial airline based in Dorado, Puerto Rico, began to solicit, principally through Apostol, interest in the sale of Wolf's stock in Dorado Wings. George McCanless ("McCanless"), a resident of New Jersey, decided to take an option to acquire Wolf's stock. Rather than acquiring such stock directly, however, McCanless incorporated plaintiff Crownair System, Inc. ("Crownair") as a Puerto Rico corporation in order to acquire the option to purchase Wolf's stock and paid Wolf an option price of $50,000. Subsequently, Walter Strycker ("Strycker"), a resident of California and Kenneth Pontikes ("Pontikes"), a resident of Illinois, joined McCanless in the venture, and each acquired one third of the stock of Crownair.[2] On May 28, 1981, the option was exercised and Crownair purchased all of the stock of Dorado Wings from Wolf for a purchase price of $2,193,038. Financing for the purchase was obtained by McCanless, Strycker and Pontikes, who delivered their unconditional personal guarantees to the Continental Illinois National Bank & Trust Company as financing lender.

In its complaint, Crownair has alleged that numerous material misrepresentations and omissions were made by Wolf, Apostol and PFK in connection with the sale of stock of Dorado Wings to Crownair. Crownair asserts that these misrepresentations and omissions constituted violations of the anti-fraud provisions of Sections 12(2) and 17 of the 1933 Act, 15 U.S.C. Sections 77l, 77q, and Section 10(b) of the 1934 Act, 15 U.S.C. Section 78j, and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. Section 240.10b–5, as well as the laws of Puerto Rico concerning fraud, negligence and breach of contract.

---

**1.** See *Rodríguez Cádiz v. Mercado Jiménez,* 579 F.Supp. 1176 (D.P.R.1983, where this Court discusses the "HOWEY test" in another context.

**2.** McCanless, Strycker and Pontikes were joined as involuntary parties plaintiff under FRCP Rule 19 by an *ex parte* order of this Court on March 23, 1983.

The claimed purpose for the acquisition of the stock of Dorado Wings by McCanless, Strycker and Pontikes through Crownair was to make a public offering of Crownair's stock by registration and sale under the 1933 Act. Upon acquisition, it was contemplated that Dorado Wings would be merged into Crownair, with Crownair as the surviving corporation. Such an "upstream merger" allegedly would have had beneficial tax implications which would serve to increase after tax earnings and, accordingly, render the stock attractive to the public. Plaintiff claims that based upon the representations made by Wolf, Apostol and PFK, it was understood that Dorado Wings was operating profitably at the time of the acquisition of Wolf's stock, and that a public offering could be undertaken within approximately one year thereafter based upon a continued showing of profitability. However, plaintiff claims that when Dorado Wings' true financial condition was discovered, including alleged losses of approximately 1.8 million dollars for the fiscal year ended July 31, 1981, as opposed to a projected profit of $500,000, the merger of Dorado Wings into Crownair and the contemplated public offering of the stock of Crownair became impossible. The action was instituted in October of 1982.

At no time has McCanless, Strycker or Pontikes been an operating officer of Dorado Wings, and none of them has been involved in its day to day business or management. None of them is employed by or has an employment agreement with either Dorado Wings or Crownair, and none receive any wages from either company. Although they are all members of the board of directors of Crownair, neither one of them alone can control the operations or affairs of Crownair or its wholly owned subsidiary Dorado Wings.

## I. THE SALE OF BUSINESS DOCTRINE

The sale of business doctrine first emerged in *Chandler v. Kew,* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 96,965 (D.Colo.1975), aff'd., 691 F.2d 443 (10th Cir.1977), where the plaintiff purchaser brought claims under the 1933 Act and the 1934 Act in an action seeking recovery of a $2,500 down payment on the purchase of an incorporated liquor store owned by the defendants. The Tenth Circuit, in affirming the dismissal of the complaint, held that there was no sale of securities because the economic reality of the transaction was that plaintiff was buying a liquor store and the shares of stock were merely passed incidentally as an indicia of ownership of the tangible goods sold to the plaintiff.

Subsequently, the Seventh Circuit in *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.1981), cert. denied, 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), more fully articulated the doctrine. The sale of business doctrine holds that notwithstanding the fact that corporate stock is sold, the "economic realities" of the transaction must be analyzed in order to determine if a "security" is involved, and if the transfer of a controlling block of stock of a corporation is merely incident to the sale of an ongoing business to a purchaser who will manage or direct the management of that business, the transaction does not constitute the sale of a security within the meaning of the 1933 and 1934 Acts. The basic rationale underlying the doctrine is the assertion that the Acts were intended to protect "investors", not "entrepreneurs." *Frederiksen v. Poloway, supra,* at 1150.

The Circuits have split on whether to accept or reject the doctrine, with the Seventh, Ninth, Tenth, and Eleventh Circuits accepting the doctrine[3] and the Second,

---

**3.** *Landreth Timber Co. v. Landreth,* 731 F.2d 1348 (9th Cir.1984), cert. granted, — U.S. —, 105 S.Ct. 427, 83 L.Ed.2d 354; *Christy v. Cambron,* 710 F.2d 669 (10th Cir.1983); *Kaye v. Pawnee Construction Co.,* 680 F.2d 1360 (11th Cir.1982); *King v. Winkler,* 673 F.2d 342 (11th Cir.1982); *Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982); *McGrath v. Zenith Radio, Inc.,* 651 F.2d 458 (7th Cir.1981), cert. denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981); *Frederiksen v. Poloway, supra; Chandler v. Kew, Inc.,* 691 F.2d 443 (10th Cir.1977).

Third, Fourth, Fifth, and Eighth Circuits rejecting it.[4] Fundamentally, there are two different analytical approaches. Those Circuits rejecting the doctrine focus on the nature of the instrument transferred in the subject transaction, while those embracing it focus on the substance of the "economic reality" of the transaction as the test for determining the applicability of the Securities Laws.

Upon a considered review of the leading decisions on the issue and the statutory language, legislative history, Supreme Court precedent, and applicable policy considerations, this Court declines to adopt the sale of business doctrine.

## II. LEGISLATIVE HISTORY AND INTERPRETATION BY THE SUPREME COURT.

The cases which have accepted the sale of business doctrine have relied principally upon the introductory language in the definitions of a security in the 1933 and 1934 Acts—"[w]hen ... the context otherwise requires ..."—and upon the Supreme Court decisions in *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) and *SEC v. W.J. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1944), as requiring an analysis of the "economic realities" of a transaction involving the sale of corporate stock.

**4.** *Ruefenacht v. O'Halloran*, 737 F.2d 320 (3rd Cir.1984); cert. granted *sub nom Gould v. Ruefenacht*, —— U.S. ——, 105 S.Ct. 428, 83 L.Ed.2d 355; *Daily v. Morgan*, 701 F.2d 496 (5th Cir. 1983); *Seagrave Corp. v. Vista Resources, Inc.*, 696 F.2d 227 (2d Cir.1982), cert. granted, —— U.S. ——, 104 S.Ct. 2341, 80 L.Ed.2d 815 (1984), cert. dismissed, —— U.S. ——, 105 S.Ct. 23, 82 L.Ed.2d 919 (1984); *Golden v. Garafalo*, 678 F.2d 1139 (2d Cir.1982); *Cole v. P.P.G. Industries, Inc.*, 680 F.2d 549 (8th Cir.1982); *Coffin v. Polishing Machines, Inc.*, 596 F.2d 1202 (4th Cir.1979), cert. denied, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979).

**5.** 15 U.S.C. § 77c(b). The policy reason underlying the exemption of short term notes was to free prime quality commercial paper sold to

## A. *Statutory Language*

Section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), provides that the term "security"

> means any note, stock, treasury stock, bond, debenture ... investment, contract ... or, in general, any interest or instrument commonly known as "security" ...

The legislative history of the 1933 Act demonstrates that Congress created a definition of a security "in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." H.R.Rep. No. 85, 73d Cong., 1st Sess. 11 (1933). In spite of this, Congress expressly chose to make certain provisions of the Acts inapplicable to certain securities. Section 3 of the 1933 Act defines as "exempted securities" a number of important types of securities such as short term notes [see, 15 U.S.C. § 77c(a)(3)], and empowers the Securities and Exchange Commission to grant additional exemptions.[5] The definition of a "security" contained in Section 3 of the 1934 Act, 15 U.S.C. § 78c(a)(10), is substantially identical to that contained in the 1933 Act.[6] The 1934 Act also authorizes the SEC to grant, either conditionally or unconditionally, additional exemptions for classes of securities. 15 U.S.C. § 78c(a)(12).

Nowhere in the exemption provisions of either the 1933 or the 1934 Act is there an exemption for the sale of all or a controlling block of corporate stock. Yet, Congress clearly had little trouble expressly

knowledgeable investors from the Act's registration requirements. Significantly, however, this "commercial paper" exception was not included in the antifraud provisions of the 1933 Act. See, 15 U.S.C. § 77q(c). The Commission's exemption power was circumscribed by the prohibition on exemptions for issues larger than $100,000 (now $5,000,000).

**6.** The Supreme Court has held that the two definitions are essentially the same. *Marine Bank v. Weaver, supra*, 455 U.S. at 555 n. 3, 102 S.Ct. at 1223 n. 3. For example, short term notes that would be exempt from the registration provisions of the 1933 Act are generally exempted from the antifraud provisions of the 1934 Act.

exempting a particular class of instruments from some or all of the Acts' provisions when it so intended. Thus Congress took care to exempt certain commercial paper from the class of "note" covered by the registration provisions of the 1933 Act and the antifraud provisions of the 1934 Act. While it might be argued that purchasers of large blocks of stock (which often occur in face to face transactions) are more knowledgeable than the average investor and, therefore, in less need of protection, the same argument would apply to the commercial paper which Congress explicitly chose to exempt. The absence of a specific exemption for the sale of a controlling block of stock is, accordingly, strong evidence that Congress did not contemplate an exception for these securities transactions from the protections of the Acts. As cogently stated in *Daily v. Morgan*, 701 F.2d at 502:

> "If Congress had wanted to exempt the privately negotiated sale of a controlling interest of stock in a small business from this antifraud provision it could have done so. In this case, the transaction is no doubt exempt from the registration requirements of '33 Act, since it would qualify as a private offering under Section 4(2) of the '33 Act, 15 U.S.C. Section 77d(2). Nor would the transaction fall under the prohibition against stock manipulation found in Section 9 of the Exchange Act, 15 U.S.C. Section 78i, which applies only to securities exchange. Congress should and did exempt small, private sales of stock from many of the requirements of the securities laws, but chose to apply the Section 10(b) antifraud provision to all stock."

Congress also gave the SEC the responsibility for identifying certain securities for exemption, and empowered the SEC to attach conditions to such exemptions to protect the investing public, indicating the Congressional belief that the SEC has the expertise and practical experience to prudently select securities for exemption and attach any necessary protective conditions. Nevertheless the SEC has never exempted the purchase or sale of a given amount of corporate stock from the definition of a security.

## B. *Supreme Court Precedent*

In *SEC v. W.J. Howey Co., supra,* the Supreme Court held that the sale and lease-back of small citrus plots, when coupled with a service contract permitting the original owner to grow and sell the crop, paying a share of the profits to the purchaser-lessor, was an "investment contract" to which the Acts were applicable. The Court established a three part test for establishing the existence of an investment contract, which has come to be known as the *"Howey* test" or the "economic realities test":

> "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, ..." 328 U.S. at 298–99, 66 S.Ct. at 1103.

There is nothing in HOWEY which suggests that Congress intended the use of more general terms, such as "investment contract", to encompass the enumerated specific definitions of a security set forth in the 1933 and 1934 Acts, such as "stock" or "note", which were well defined by state law. *Howey* concluded only that unusual investment arrangements or schemes that did not fall within the specific definitions of a "security" would still be within the Acts' terms if they met the standards of an "investment contract."

The Supreme Court was presented with an issue at the opposite end of the spectrum from *Howey* in *United Housing Foundation, Inc. v. Forman, supra.* There, the issue was whether the sale of instruments labelled "stock", representing ownership interests in a cooperative apartment, were securities to which the securities laws were applicable. Although the shares were denominated "stock" they had none of the usual attributes associated with stock, such as the right to receive dividends, voting rights, negotiability or

ability to appreciate in value. The District Court in *Forman* had granted defendant's motion to dismiss the complaint on the ground that the shares of co-op stock were not securities and the Court of Appeals for the Second Circuit had reversed on two alternative grounds. It first held that since the shares were denominated "stock" the literal application of the definitional section required that they be considered securities within the Acts. Alternatively, the Second Circuit concluded that the transaction was an investment contract within the meaning of the Acts and as defined by *Howey*, since there was expectation of profits from several sources.

The Supreme Court's analysis in *Forman* was a two-step process in which it first considered whether the co-op shares were "stock" and looked to the characteristics usually associated with such instruments to make its determination. It was only after it had determined that the shares of co-op stock had none of the traditional characteristics of "stock" that it did apply the *Howey* test to determine if the scheme was an "investment contract." Although in its analysis of the term "stock" the Court noted that "form should be disregarded for substance and the emphasis should be on economic reality"[7] it explicitly cautioned that:

> "[W]e do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply. *This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.*" 421 U.S. at 850–851, 95 S.Ct. at 2059–2060. (Emphasis added.)

The *Forman* court thus only applied the economic reality test to ascertain whether an instrument labelled "stock" was in fact a stock interest as that term has historically been understood. The "economic reali-

ties" of the transaction were to be examined only if the instrument in question had none of the significant characteristics typically associated with stock. Since the co-op shares in issue in *Forman* had none of the characteristics that would fall within the ordinary concept of a stock, i.e., the right to receive dividends contingent upon the apportionment of profits, transferability, voting rights and ability to appreciate in value, the Court held that they were not "stock" for the purposes of the Acts. It was only in analyzing the Second Circuit's alternative holding, i.e., that the co-op shares were an investment contract within the securities laws, that the Supreme Court applied the HOWEY test. In assessing the "economic reality" of a stock transaction, the label attached to the instrument is scrutinized by first looking to the *underlying attributes of the instruments*. If the transaction or instruments do not meet the common definitions of a "security", then the HOWEY test is utilized to evaluate whether the transactions or instruments are investment contracts.

More recently, the Supreme Court in *Marine Bank v. Weaver, supra,* considered whether or not a certificate of deposit from a federally regulated bank was a security for the purposes of the anti-fraud provisions of the Acts. The Court of Appeals for the Third Circuit had concluded that the certificate of deposit was the functional equivalent of the withdrawable capital shares of a savings and loan association held to be securities in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The Supreme Court, in reversing, held that *Tcherepnin* was not controlling in that there the purchasers received dividends based upon the association's profits and also received voting rights. Thus, the withdrawable capital shares in *Tcherepnin* were much more like ordinary shares of stock and the ordinary concept of a security than a certificate of deposit. Significantly, although the *Marine Bank* court looked at the economic realities of the transaction as in *Forman,*

7. 421 U.S. at 848, 95 S.Ct. at 2058.

its first step was again to analyze whether or not the certificate of deposit[8] had any of the traditional attributes of a security. 455 U.S. at 557, 102 S.Ct. at 1224. It was only after determining that the certificates did not have such characteristics that the Court then went on to analyze whether or not the separate business agreement constituted an investment contract under the HOWEY test. The two step analysis in *Marine Bank* thus paralleled the two step analysis employed in *Forman*.

As the Second Circuit in *Golden v. Garafalo, supra,* reasoned, "[i]f 'economic reality' is the universal jurisdictional test under the Acts", then the Court would be forced to ignore a major portion of the discussion in *Forman* as pointless. 678 F.2d at 1144.[9] The Second Circuit's adoption of this two step method of analysis is consistent with *Forman* and *Marine Bank*. In determining whether the Acts apply to the instruments in question, the District Court is first called upon to determine if they have the ordinarily accepted attributes of stock.[10] Only if the instrument does not have the characteristics ordinarily associated with stock is it necessary to apply the "economic realities" test set forth in HOWEY. See, e.g., *Vorrius v. Harvey,* 570 F.Supp. 537 (S.D.N.Y.1983) (loan participation agreement not a security under "economic reality" test).

## III. POLICY CONSIDERATIONS

An analysis of the sale of business doctrine reveals numerous policy considerations regarding the protection afforded securities under the 1933 and 1934 Acts, which also militate against acceptance of the doctrine.

### A. *Uncertainty of Application.*

The application of the sale of business doctrine is entirely dependent on a determination of corporate control, since a purchaser of a control share of a corporation cannot be found to derive profits "from the efforts of others." Of course, corporate control may be exercised with less than 100% ownership of the stock of a company, and the doctrine must logically be applied to all purchases and sales of a controlling stock interest. *Sutter v. Groen, supra,* note 2 at 203. This makes it necessary, however, to examine in every securities transaction the niceties of corporate control. Although alliances among minority shareholders may give one faction control, or family members may own sufficient stock to constitute a controlling faction, the principles for the attribution of stock ownership in such circumstances are uncertain. Apart from the peculiarity of making the determination of a security revolve around these factors, they raise the possible necessity of evidentiary hearings in each case simply to determine whether an instrument is a security.

The tendency to disregard this uncertainty of application by the courts which have accepted the sale of business doctrine, see, *Sutter v. Groen, supra,* note 2 at 202, is troubling. For it must be remembered that rules affecting securities impact not only upon the courts, but also upon members of the public who must structure their affairs accordingly. For example, attorneys would need to be retained to opine whether the purchase of a large block of stock is the acquisition of a security or not. Uncertain-

---

**8.** The definition of a "security" in the 1934 Act includes the term "certificate of deposit, for a security." However, this term does not refer to the bank certificates of deposits such as were purchased in *Marine Bank.*" Instead, that term refers to instruments issued by protective committees in the course of corporate reorganizations. 455 U.S. at 557, n. 5, 102 S.Ct. at 1224 n. 5.

**9.** "Congress intended the securities laws to cover those instruments ordinarily and commonly considered to be securities in the commercial

world..." *Marine Bank v. Weaver, supra,* at 559, 102 S.Ct. at 1225.

**10.** Such attributes include acceptance of the instrument as stock for purposes of local corporation and commercial law and for purposes of local, state and federal tax law; entitlement of its holders to dividends and realization of appreciation in value; and alienability by way of transfer to others or by pledge as collateral. *Seagrave Corp. v. Vista Resources, Inc.,* 696 F.2d at 229.

ty will also be created over whether registrations are necessary. When buyer and seller are unable to readily predict whether their instruments are "securities" at all, that uncertainty has real economic costs. It raises the costs of the transactions, inhibits the flow of capital, engenders litigation and as a result benefits neither the parties nor the courts.

The uncertainty of the application of the sale of business doctrine also necessarily affects the transaction costs associated with certain instruments. The protection afforded certain instruments covered by the Acts, enhances their marketability by reducing the transaction costs associated with such instruments, i.e., buyers may rely on the accuracy of representations without the need for expensive investigation into information which is in the control of the seller and without demanding a premium price to reflect the risk of fraudulent representation.[11]

"One of Congress' purposes in singling out the named instruments in the Act was to facilitate such transactions without the ensuing delays, duplication of effort, and expenses associated with the 'caveat-stockholder' era of deregulation. *See* H.R.Rep. No. 1383, 73d Cong., 2d Sess., 4–5 (1934). Denial of the Acts' protection in these circumstances would undermine this Congressional policy." *Ruefenacht v. O'Halloran, supra,* note 3 at 333.

"Of course the buyer may hire accountants and attorneys to scrutinize the seller's business; however, it is more efficient for the seller to warrant the accuracy of representations made than for the buyer to expend substantial amounts of time and money unearthing facts already known to the seller. This efficiency is one of the purposes of the Acts and promotes the marketability of securities

and free flow of capital." *Ruefenacht v. O'Halloran, supra,* note 3 at 333, n. 32.

### B. *Expectations of the Parties and Reliance.*

By choosing to deal in stock in structuring a particular transaction the parties have a justifiable expectation that the Acts will apply and rely on that expectation for the concomitant reduction of transaction costs. Such reliance is reasonable when the stock purchased has the traditional attributes commonly associated with stock ownership:

"There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument." *United Housing Foundation, Inc. v. Forman, supra,* 421 U.S. at 850–851, 95 S.Ct. at 2059–2060.

The stock of Dorado Wings unquestionably had all of the characteristics traditionally associated with stock.[12] Additionally, plaintiff's expectation that the Dorado Wings shares were securities to which the Acts were applicable is demonstrated by the plan to merge Dorado Wings and Crownair ultimately to make a public offering by registering the stock under the 1933 Act.

### C. *Difficulty of Application and Anomalous Results.*

The focus of the sale of business doctrine on distinguishing between commercial and investment motives and the ability of the purchaser to control post acquisition operations, has rendered the determination of whether a particular instrument is a security entirely arbitrary and has produced anomalous results. Thus, whereas the sale of

---

**11.** Although such risks may be reduced by the employment of professionals to thoroughly investigate the details of the seller's business, such investigation is costly, inefficient and time consuming, raising transaction costs and inhibiting the flow of capital. Additionally, even such

extensive investigation will not protect a purchaser from deliberate fraud.

**12.** See paragraph 3.02 of the Stock Purchase Agreement relating to the capitalization of Dorado Wings.

all of a corporation's stock to a single buyer by several sellers, each of whom did not formerly exercise control, is a securities transaction as to the sellers but not as to the buyer.[13] Similarly, the sale of stock to two purchasers, one buying a controlling share and one buying a minority share, would constitute a sale of securities to the purchasing minority shareholder but not as to the purchasing controlling shareholder. The application of the doctrine can also result in the very same instruments being considered securities for one transaction but not for another.[14] A series of stock sales, each insufficient to transfer control from a single seller to a single buyer would appear to constitute the sale of securities, although the final stock sale resulting in the transfer of control to the purchaser would not. This very same transaction accomplished by means of a single purchaser rather than a series of step transactions, would not, however, constitute the sale of securities under the doctrine.

The distinctions required by the sale of business doctrine which produce these anomalous results are artificial. To say that shares of stock are not securities for purposes of the 1933 and 1934 Acts because the purchaser acquired a controlling interest is illogical and often unfair when the very same shares of stock purchased by another in the very same transaction are treated as securities for the purposes of the Acts. To tell a defrauded purchaser that he has no federal remedy since he bought 51% of the stock of a company, while leaving a remedy for the purchaser who bought 49% of the stock in the same transaction, has no basis in policy, theory and practice. The possibility of fraud is not dependent upon whether the purchaser acquires 49% or 51% of a business. Nor is the purchaser's ability to discover fraud uniformly greater when a controlling interest is acquired. In fact, "control" is largely irrelevant to the risk of and capacity to discover fraud.

"The Seventh Circuit has recently held that, under the doctrine, when a purchaser acquires more than 50% of a business, his purpose in purchasing the stock will be presumed to have been entrepreneurship rather than investment, and he will not be covered by the securities laws unless the presumption can be overcome by a showing that the main purpose was investment. *Sutter v. Groen*, 687 F.2d 197, 203 (7th Cir.1982). A rule that tells a defrauded purchaser that he has no federal remedy since he bought 51% of the stock in a business, while leaving a remedy for his partner who bought 49% of the stock, seems no less arbitrary than the alternative rule." *Daily v. Morgan*, 701 F.2d at 503.

The terms chosen by Congress to define a security, such as "stock", "bond", or "note", were terms with well known meanings under state law. These meanings did not change with who owned the instrument at any particular moment. The chameleon-like quality of stock under the sale of business doctrine is entirely inconsistent with the history and purpose of the Acts.

### D. *Need for Protection.*

A principal argument made by supporters of the sale of business doctrine is that the legislative intent behind the 1933 and 1934 Acts was to protect "investors", not "entrepreneurs." E.g., *Sutter v. Groen, supra*, note 2 at 201. Yet, it would be a mistake to conclude that Congress had only a single purpose in enacting either the 1933 or 1934 Act. Congress obviously acted with a number of rationales in mind, among them, to facilitate commerce in certain named instruments, to reduce transaction costs, and to enhance the free flow of capital. Thus, while the one intent may have been to protect investors in the public exchange markets, the protection afforded

---

**13.** *McGrath v. Zenith Radio Corp., supra*, note 2 at 467–68 n. 5.

**14.** See, *Oakhill Cemetery of Hammond, Inc. v. Tri-State Bank*, 513 F.Supp. 885, 890 (N.D.Ill. 1981).

by the Acts' antifraud provisions is not so limited.[15]

Additionally, the distinction between an "investor" and an "entrepreneur" is ambiguous at best. Some investors choose to enhance the return on their investment by participating in the management of a business. Yet this does not make them entrepreneurs.

> "Who is to say that plaintiffs did not hope at some future date to resell the shares and realize an appreciation in their value, like investors in "growth" stocks which pay little or no dividends... In truth, purchasers of a business rightly regard themselves as investors as well as managers. Transfers of corporate control frequently are motivated by hope for capital gains resulting from improved management, and it is altogether artificial to classify such transactions as exclusively commercial." *Golden v. Garafalo, supra*, note 3 at 1146.

While the Seventh Circuit, in the course of refining the sale of business doctrine has acknowledged that purchasers may be both investors and entrepreneurs, the assumption is that the investment motive must be the purchaser's main purpose, *Sutter v. Groen, supra*, note 2 at 203, thus requiring inquiries into the subtleties of intent as well as the extent of corporate control. Again, the determination that a purchaser's main purpose is investment is essentially an arbitrary one.

A related argument is that the purchaser of a majority of the stock of a company does not need the protection of the Acts because he has sufficient bargaining power to obtain disclosure and the opportunity to inspect the business. While it may be true that such a purchaser may thus be able to demand and obtain the same material information which is otherwise obtained through the affirmative financial reporting requirements of the 1933 Act, there is still the need for protection against securities fraud. In neither circumstance will the financial information provided by a seller necessarily protect the purchaser from deliberate falsification. In fact, in most cases, it is the undisclosed liabilities of the corporation which prompt the suit. Unlike a purchaser of the assets of a business, in acquiring 100% of the stock of a corporation the purchaser acquires both the disclosed and undisclosed liabilities of the corporation. The purchaser must necessarily rely almost entirely on the seller's complete disclosure of the corporate liabilities. Thus, despite the entrepreneurial purchaser's ability to demand material information, it is apparent that he is as vulnerable to the seller's deliberate falsification of corporate liabilities and in need of protection of the Acts as is the so-called investment purchaser. See, e.g., *Exchange Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir.1976).

One commentator has argued that the acquisition of management control is a critical factor in making an investment decision which is vulnerable to information failure and thus requires Federal Securities Law protection. It is argued that the decision to purchase corporate stock is based upon an assessment of investment risk, which assessment is significantly affected by available information on the extent to which corporation control can be meaningfully utilized to maximize return on the investment. For example, the purchaser must be able to determine whether he will be able to utilize that control to change the risk/return characteristics of the business, such as in hiring and firing, changing lines of business, financing, or revamping products and plants. The seller is the source of the information needed to determine the extent to which such control is meaningful and often there are no alternative sources of information. The prospective purchaser is, thus placed in a vulnerable position. Because of the disparity of access to material information affecting the value of the

---

**15.** For example, while many securities are exempt from the filing requirements of the 1933 Act, they are not exempted from the antifraud provisions of the 1933 Act or the disclosure requirements of the 1934 Act. See e.g., Section 10(b) of the 1934 Act, 15 U.S.C. Section 78j.

stock, reasonable reliance must be placed on the seller to disclose that information.[16]

"Where such circumstances exist, the transaction embodies all the essential attributes of an investment, notwithstanding the purchaser's ownership and managerial control *after* the transaction. The economic reality of the transaction is determined by the evaluation of the investment risk existing prior to, and simultaneous with, the point at which the investment decision is made, and not by analysis of whether future profits will accrue from the managerial control of the purchaser. If the purchaser's stock valuation calculus, taking future managerial control into account, is hampered because the evaluation is based upon information supplied by the seller or publicly available to any investor but without the advantage of equal access to all material information, the transaction is indistinguishable from any purchase of stock protected by the antifraud provisions of the securities laws. Therefore, as a matter of sound policy and common sense, *those protections should be available,* and it is reasonable for purchasers in those circumstances to expect such protections." Rapp, *supra,* note 19 at 621 (emphasis in original) (footnote omitted).

In terms of economic reality, the future right of a prospective purchaser to exercise control over a business is entirely meaningless if the economic conditions of the enterprise have been misrepresented by the seller prior to the transaction. This point is well illustrated by *Coffin v. Polishing Machines, Inc., supra,* note 3. There, although subsequent to the sale the purchaser held veto power as a 50% stockholder and managerial power as executive vice president, those rights were meaningless because the corporation was actually insolvent and there was a pre-existing scheme to convert the corporate assets. The purchaser's ability to participate in the future management of the business was totally insignificant once its insolvency was discovered. *Coffin v. Polishing Machines, Inc., supra,* note 3 at 1203–04.

The argument that the stock purchaser is adequately protected because of the existence of a remedy under Commonwealth law for fraud simply begs the question. State law remedies for fraud are concurrent with remedies under the Acts, and the fact that one is protected by state law does not preclude a federal statutory remedy. Congress did not limit the protection of federal law only to instances where there was no state remedy. In view of the Supreme Court's frequent emphasis on the remedial nature of the Acts,[17] the availability of state law remedies is irrelevant to the need for and the availability of a remedy under the Acts.

Because the Court bases its holding on the rejection of the sale of business doctrine, it needs not reach plaintiff's alternative argument that even under the sale of business doctrine there was a sale of securities under the facts of this case, in view of the allegations that the three shareholders—McCanless, Strycker, and Pontikes—each with a 33⅓% interest, do not individually possess control of the corporation.[18]

In sum, the Court finds that the statutory language, the legislative history, Supreme Court precedent, and policy considerations compel the acceptance of jurisdiction in this action.[19] The sale of the stock of Dorado Wings was a sale of securities

---

**16.** Rapp, *Federal Securities Laws Should Protect Some Purchasers of All or Substantially All of a Corporation's Stock,* 32 Case Western L.Rev. 595, 619–21 (1982).

**17.** See, *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 689–690, 74 L.Ed.2d 548 (1983) (availability of express remedy under Section 11 of 1933 Act does not preclude action under Section 10(b) of 1934 Act); *Tcherepnin v. Knight, supra,* 389 U.S. at 336, 88 S.Ct. at 553.

**18.** We have found no precedent applying the doctrine to more than two purchasers who have not been previously associated. See, Seldin, *When Stock Is Not a Security: The "Sale of Business" Doctrine Under the Federal Securities Laws,* 37 Bus.Law 637, 662 (1982).

**19.** See, Notes, *Repudiating the Sale-of-Business Doctrine,* 83 Columbia Law Rev. 1718; Contra, Thompson, *The Shrinking Definition of a Security: Why Purchasing of a Company's Stock is not a Federal Security Transaction.*

for which the Acts provide protection. Accordingly, defendants' motions to dismiss the complaint are denied.

Finally, recognizing that this order is interlocutory in nature, and would not otherwise be appealed, and being of the opinion that this order involves a controlling question of law as to which there is a substantial ground for a difference of opinion,[20] and believing that an immediate appeal from this order may materially advance the ultimate termination of this litigation, this Court shall certify this order for appeal to the First Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b).

IT IS SO ORDERED.

**20.** See pages 1480–81, *supra,* of this Order, discussing the divergence of opinion among the courts. The Supreme Court has granted certiorari on conflicting decisions by the Courts of Appeals for the Ninth and Third Circuits, accepting and rejecting the sale of business doctrine respectively. —— U.S. ——, 105 S.Ct. 428, 83 L.Ed.2d 355.